Appeal No. 2014-1390

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

SOUTHCO, INC.

*Plaintiff-Appellant,*

v.

FIVETECH TECHNOLOGY INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the Eastern District of
Pennsylvania in Case No. 10-cv-01060-MAM, Judge Mary A. McLaughlin

_____

NON-CONFIDENTIAL BRIEF OF
PLAINTIFF-APPELLANT SOUTHCO, INC.

_____

Benjamin E. Leace
Brian S. Seal
Andrew J. Koopman
Christopher H. Blaszkowski
RATNER PRESTIA
1235 WESTLAKES DRIVE
SUITE 301
BERWYN, PA 19312
610−407−0700

*Attorneys for Plaintiff-Appellant
Southco, Inc.*

June 2, 2014

## CERTIFICATE OF INTEREST

1.     The full name of every party or amicus represented by the undersigned is Southco, Inc.

2.     The name of the real party in interest is Southco, Inc.

3.     The following non-governmental corporate entity owns 10 percent or more of the stock of the party represented by the undersigned: TouchPoint, Inc. (formerly known as South Chester Tube Company).

4.     The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this Court are:


Benjamin E. Leace                     James Charles McConnon
Brian S. Seal                         Alex R. Sluzas
Andrew J. Koopman                     Antranig Baronian
Christopher H. Blaszkowski            Ourmazd Ojan
RATNER PRESTIA                        PAUL AND PAUL
1235 WESTLAKES DRIVE                  TWO THOUSAND MARKET ST.
SUITE 301                             SUITE 2900
BERWYN, PA 19312                      PHILADELPHIA, PA 19103−3201
610−407−0700

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF AUTHORITIES ................................................................ vii

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF JURISDICTION .......................................................2

STATEMENT OF THE ISSUES ............................................................3

STATEMENT OF THE CASE ...............................................................4

I.  THE ASSERTED PATENTS ..........................................................4
II.  THE ASSERTED TRADEMARKS ................................................7
III.  DISTRICT COURT PROCEEDINGS ...........................................9
  A.  Expert Reports ..................................................................9
  B.  Summary Judgment—'095 and '131 Patents ...................12
  C.  Summary Judgment—'012 Patent ..................................13
  D.  Summary Judgment—Asserted Trademarks ...................15

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .......................................................................................17

I.  STANDARD OF REVIEW .........................................................17
  A.  Claim Construction ..........................................................17
  B.  Summary Judgment ..........................................................18
    1.  Patent Infringement ...............................................19
    2.  Trademark Infringement ........................................20
  C.  Evidentiary Rulings .........................................................21
II.  THE DISTRICT COURT ERRED BY MISCONSTRUING TERMS
  IN THE CLAIMS OF THE '095, '131, AND '012 PATENTS ...................24
  A.  The district court erred by misconstruing the term "attached" in
    the asserted claims of the '095 Patent and '031 Patent to mean
    "directly" attached ..........................................................24
    1.  The intrinsic evidence supports Southco's proposed
      construction of the term "attached" .........................24
    2.  The district court improperly limited its construction to
      one of the preferred embodiments in the specification ............26

3. The district court failed to provide any separate construction or analysis of the term "engaged" in the '131 Patent ...................................................................28

4. The district court's improper construction of the term "attached" was the direct cause of its improper grant of summary judgment................................................29

B. The district court erred by misconstruing the phrase "rigidly secure" in the asserted claims of the '095 Patent and '031 Patent to include an additional "displacement" requirement.......................................................................30

1. The intrinsic evidence does not support adding a "displacement" limitation to the claims...................................30

2. The district court improperly imported the features of one of the preferred embodiments into the claims ..........................32

3. The district court's improper construction of the phrase "rigidly secured" was the direct cause of its improper grant of summary judgment ......................................................34

C. The district court erred by misconstruing the phrase "fills the chamfer" in the asserted claims of the '012 Patent to include the additional "displacement" requirement..............................................34

III. THE DISTRICT COURT ERRED IN ITS ANALYSIS OF THE DOCTRINE OF EQUIVALENTS WITH RESPECT TO THE ASSERTED CLAIMS OF THE '095 PATENT AND '031 PATENT........36

A. The district court erred by misapplying the law regarding the Doctrine of Equivalents.....................................................36

B. The district court erred by not properly considering the evidence provided by Southco showing a genuine issue of fact regarding whether the Accused Product is equivalent to the asserted claims.........................................................38

IV. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE '012 PATENT ..........40

A. The district court erred by ruling there was no genuine issue of fact regarding the presence of an "annular chamfer" in the Accused Product..............................................40

B. The district court erred by ruling there was no genuine issue of fact as to whether the knob material in the Accused Product "fills said chamfer".........................................................46

C. The district court erred by failing to conduct a proper analysis under the Doctrine of Equivalents........................................47

iv

V.    THE DISTRICT COURT ERRED BY FAILING TO EXCLUDE
      THE DORNFELD DECLARATION PURSUANT TO FED. R. CIV.
      P. 26 AND 37. ...................................................................................49
      A.    The district court erred by failing to consider all of the
            *Pennypack* factors.............................................................50
      B.    The proper application of the Pennypack factors requires
            exclusion of the Dornfeld Declaration .................................51
            1.    The district court erred in concluding that Southco was
                  not prejudiced by the Dornfeld Declaration .........................52
            2.    The district court erred in concluding that Southco's
                  Opposition cured the prejudice caused by the Dornfeld
                  Declaration ..............................................................55
            3.    Admitting the Dornfeld Declaration would disrupt and
                  delay the trial...........................................................55
            4.    Fivetech's disregard of the Scheduling Order and
                  unsatisfactory explanation for doing so demonstrates its
                  bad faith and willfulness .............................................56
            5.    Fivetech failed to establish the Dornfeld Declaration's
                  importance...............................................................57
VI.   THE DISTRICT COURT ERRED BY GRANTING SUMMARY
      JUDGMENT OF NONINFRINGEMENT OF THE ASSERTED
      TRADEMARKS.............................................................................59
      A.    The district court erred in concluding that Fivetech did not use
            the Segmented Circle Mark "in commerce" .......................59
            1.    The district court's decision is based on the wrong
                  definition of "use in commerce."....................................59
            2.    Fivetech's uses of the Segmented Circle Mark are each a
                  "use in commerce" within the meaning of 15 U.S.C. §
                  1114.......................................................................62
            3.    The district court improperly resolved a genuine dispute
                  of material fact in the face of the sworn declaration of
                  Fivetech's trademark attorney, Mr. Rabin, that actual use
                  had occurred ............................................................64

CONCLUSION.....................................................................................67

ADDENDUM TABLE OF CONTENTS .............................................68

ADDENDUM ..................................................................................... A1

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 42 consists of a representative engineering drawing for the Accused Product and a description thereof.

# TABLE OF AUTHORITIES

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
   265 F.3d 1294 (Fed. Cir. 2001) ........................................................23

*AFG Indus. Inc. v. Cardinal IG Co., Inc.*,
   375 F.3d at 1371 (2004) ...............................................................39

*Afros S.p.A. v. Krauss-Maffei Corp.*,
   671 F. Supp. 1402 (D. Del. 1987) ....................................................48

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................ 19, 43, 53, 74

*Applied Medical Resources v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006) ......................................................19

*AvePoint, Inc. v. Power Tools, Inc.*,
   No. 13-0035, 2013 WL 5963034 (W.D. Va. Nov. 7, 2013).............................70

*Bosley Medical Institute, Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ..........................................................72

*Bouder v. Prudential Fin., Inc.*,
   No. 06- 4359, 2010 WL 2026707 (D.N.J. May 21, 2010) .................................59

*Buti v. Perosa, S.R.L.*,
   139 F.3d 98 (2d Cir. 1998) ........................................................ 68, 69

*Calhoun v. Yamaha Motor Corp. U.S.A*,
   350 F.3d 316 (3d Cir. 2003) ..........................................................57

*CIAS, Inc. v. Alliance Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007) ......................................................41

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998) ......................................................34

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) .............................................. 57, 58, 59

*Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*,
   99 Fed. Appx. 911 (Fed. Cir. 2004) ...................................................20

*Eolas Techs. Inc. v. Microsoft Corp.*,
   399 F.3d 1325 (Fed. Cir. 2005) ......................................................18

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
   Nos. 09-1325, 1346, 2010 WL 3862902 (Fed. Cir. 2010) .................................59

*Exxon Corp. v. Halcon Shipping*,
   156 F.R.D. 589 (D.N.J.1994) ..........................................................63

*Freeman v. Gerber Products Co.*,
   388 F. Supp. 2d 1238 (D. Kan. 2005) .................................................48

*Frolow v. Wilson Sporting Goods, Co.*,
No. 05- 4813, 2008 WL 918495 (D.N.J. Mar. 31, 2008).....................................60

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
No. 2013–1267, ___ F.3d ____, 2014 WL 1704518 (Fed. Cir. May 1, 2014) .. 19,
31, 37

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ..................................................................... 24, 56

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ...............................................................................58

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999) ...................................................................... 26, 56

*Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercles des Etrangers a
Monaco*,
329 F.3d 359 (4th Cir. 2003) ..................................................................... 68, 69

*Konstantopoulos v. Westvaco Corp.*,
112 F.3d 710  (3d Cir. 1997) ...................................................................... 55, 65

*Koon v. United States*,
518 U.S. 81 (1996) .........................................................................................24

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999) .................................................................................. 23, 59

*Laurel Capital Group v. BT Financial Corp.*,
45 F. Supp. 2d 469 (W.D. Pa. 1999) ...............................................................70

*Lighthouse Ministry v. Found. for Apologetic Info. and Research*,
527 F.3d 1045 (10th Cir. 2008) .......................................................................69

*Lighting Ballast Control LLC v. Phillips Electronics North America Corp.*,
744 F.3d 1272 (Fed. Cir. 2014) (*en banc*).......................................................17

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003) .................................................................. 40, 41

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*,
690 F.3d 1354 (Fed. Cir. 2012) .......................................................................24

*Meyers v. Pennypack Woods Home Ownership Ass'n*,
559 F.2d 894 (3d Cir. 1977) ................................................................... passim

*Moore v. Vangelo*,
No. 03-4718, 2005 WL 2178885 (E.D. Pa. Sept. 6, 2005) .................................60

*Orthovita, Inc. v. Erbe*,
No. 07-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008) ..................................71

*Patterson v. Balsamico*,
440 F.3d 104 (2d Cir. 2006) .............................................................................64

*Rescuecom Corp. v. Google, Inc.*, n
562 F.3d 123 (2d. Cir. 2009) ..................................................................... 23, 67

*Scully v. US WATS, Inc.*,
   238 F.3d 497 (3d Cir. 2001) ...................................................................73
*Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*,
   272 F.R.D. 350 (W.D.N.Y. 2011) .............................................................25
*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952) .................................................... 22, 67, 71, 72
*Superguide Corp. v. DirecTV Enterprises, Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) .............................................. 18, 31, 37
*Tommy Bahama Grp., Inc. v. Sexton*,
   No. 07-06360 EDL, 2009 WL 4673863 (N.D. Cal. Dec. 3, 2009) ....................71
*United We Stand Am., Inc. United We Stand, Am. New York, Inc.*,
   128 F.3d 86 (2d. Cir. 1997) ....................................................................22
*Vehicular Tech. Corp. v. Titan Wheel Int'l Inc.*,
   212 F.3d 1377 (Fed. Cir. 2000) .............................................................21
*Walsh v. Chez*,
   583 F.3d 990 (7th Cir. 2009) ..................................................................24
*Zelinski v. Brunswick Corp.*,
   185 F.3d 1311 (Fed. Cir. 1999) ....................................................... 20, 40
*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ...................................................................26

**Statutes**
15 U.S.C. § 1114......................................................................... 67, 71
15 U.S.C. § 1114(a) ..................................................................................21
15 U.S.C. § 1116.........................................................................................2
15 U.S.C. § 1121.........................................................................................2
15 U.S.C. § 1127 ............................................................................ 22, 67, 68
28 U.S.C. § 1295(a)(1)................................................................................2
28 U.S.C. § 1331.........................................................................................2
28 U.S.C. § 1338(a) ...................................................................................2
Fed. R. Civ. P. 26 .......................................................................................60
Fed. R. Civ. P. 26 (e) .................................................................................25
Fed. R. Civ. P. 26(a) ..................................................................................25
Fed. R. Civ. P. 26(a)(2)(B)(i) .....................................................................24
Fed. R. Civ. P. 37(c)(1).............................................................................25

## <u>STATEMENT OF RELATED CASES</u>

No other appeal in or from the same civil action or proceeding was previously before this or any other appellate court, nor is there any other appeal pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) for the patent claims and under 15 U.S.C. §§ 1116 and 1121 for the trademark claims. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1), in that this appeal arises from a final decision of the district court entered on January 24, 2014 (amended January 28, 2014) in a civil action arising under an Act of Congress relating to patents. Southco, Inc. timely filed its Notice of Appeal on February 21, 2014.

## STATEMENT OF THE ISSUES

1.  Did the district court err by construing the term "attached" in claims 1, 4, 7, 10, and 13 of U.S. Patent No. 5,851,095 (the "'095 Patent") and in claims 9 and 14 of U.S. Patent No. 6,280,131 (the "'131 Patent") to mean "directly attached?

2.  Did the district court err by construing the phrase "rigidly secure" in claims 1, 6, 8, and 14 of U.S. Patent No. 6,468,012 (the "'012 Patent") to require "displacing" knob material?

3.  Did the district court err by granting summary judgment that the accused product does not infringe claims 1-15 of the '095 Patent and claims 1-15 of the '031 Patent under the Doctrine of Equivalents?

4.  Did the district court err by granting summary judgment that the accused product does not infringe claims 2-5 and 7-14 of the '012 Patent on the basis that it does not include a "chamfer" or material that "fills" the chamfer?

5.  Did the district court err by denying Southco's motion to strike the Declaration of Dr. Dornfeld and then relying on the Dornfeld Declaration in granting summary judgment that the accused product does not infringe claims 2-5 and 7-14 of the '012 Patent?

6.  Did the district court err by concluding that Fivetech did not use its infringing Segmented Circle trademark in commerce?

## STATEMENT OF THE CASE

## I.    THE ASSERTED PATENTS

Southco asserts that Fivetech infringes claims 1-15 of the '095 Patent, claims 1-15 of the '131 Patent, and claims 1-14 of the '012 Patent.

Claim 1 of the '095 Patent is representative of the asserted claims from the '095 and '131 Patents.   While the claims are not limited to the disclosed embodiments, reference is made to the exemplary embodiment shown in FIG. 3 of the '095 Patent for illustration.  Claim 1 recites a captive screw (such as screw 20) having a head portion (such as head portion 24) and a threaded shaft (such as threaded shaft 22), a hollow knob (such as knob 30), and a hollow ferrule (such as ferrule 50) through which the threaded shaft of the screw slides.



An end of the ferrule is "slidably and rotatably attached" to the knob (or, in the case of claim 1 of the '131 Patent, "slidably and rotatably engaged") to prevent the ferrule and knob from separating. (A4550, col. 6, lines 26-27.)

Claim 1 of the '012 Patent recites a similar captive screw whose head portion has a plurality of protrusions (such as protrusions 26) on its outer perimeter, as shown in FIGS. 4 and 5 of the '012 Patent. (A4576, col. 6, lines 17-20.)



The protrusions "rigidly secure" the head portion of the screw to the inner surface of the knob. (A4576, col. 6, lines 21-23.)

Claim 7 of the '012 Patent requires the screw head portion to have an annular chamfer (such as chamfer 29) peripheral to its bottom surface, as shown in FIG. 10 of the '012 Patent. (A4577, col. 7, lines 8-10.)



## Fig. 10

The 46 Series Captive Screw sold by Fivetech (the "Accused Product") comprises a threaded screw, a knob, and a ferrule. (*See* A1072.) For purposes of this appeal, the relevant questions regarding infringement are whether the Accused Product has (1) a ferrule that is "attached" (or "engaged") to the knob, (2) protrusions that "rigidly secure" the screw head to the knob, and (3) an annular chamfer.

6

## II.    THE ASSERTED TRADEMARKS

Southco also asserts that Fivetech infringes U.S. Trademark Registration Nos. 2,478,685 (the "'685 Registration") and 3,678,153 (the "'153 Registration") (collectively, "the Asserted Trademarks"). These registrations are for "circles of segmented curved lines" which appear on the top surface of the knob of Southco's captive screws. Drawings of the mark from the '685 and '153 Registrations are shown below.



**'153 Registration  (A4578)**          **'685 Registration (A4579)**

Certain of the Accused Products bear Fivetech's mark, shown below, which it describes as "a pattern of 5 wider ridges along the outer circumference with a circle of 5 segmented curved lines interrupted by 5 pentagon shapes" (the "Segmented Circle Mark").  (A269-281.)



Fivetech filed an application in the USPTO to register its Segmented Circle Mark ("the Segmented Circle Application") on March 25, 2010.  (A269-281.)  In its application, Fivetech's attorney, Mr. Steven M. Rabin, declared that the mark was "first used in commerce at least as early as 03/10/2010, and is now in use in such commerce."  (A274-275.)

Fivetech's website includes an online catalog of its products, some of which bore the Segmented Circle Mark.  (A82-87; A283.)  In 2010, the catalog depicted numerous types of captive screws that had part numbers beginning with the series "46-321," "46-421," "46-732," and "46-832" and which bore the Segmented Circle Mark (collectively, the "46 Series Catalogue Screws").  (A85-86.)  Fivetech's

catalog also included "21 Series" SMT-style captive screws which bore the Segmented Circle Mark. (A2595-2597.)

On March 12, 2010, Fivetech provided a price quote to Specialty Resources, Inc. ("SRI"), a corporation residing in the United States. (A216.) Fivetech offered to sell to SRI at least 100 units of each of four different captive screws, including 46 Series Catalogue Screws (e.g., part number 46-421-598-10N-4). (*Compare* A216 *with* A85.)

## III.  DISTRICT COURT PROCEEDINGS

### A.  Expert Reports

The district court's Scheduling Order required disclosure of expert witnesses by the close of fact discovery, and set deadlines of February 6, 2012 for opening expert reports and March 6, 2012 for rebuttal expert reports. (A977-78.) Adhering to those deadlines, Southco designated its technical expert, John D. Pratt, Ph.D., and timely served a report setting forth Dr. Pratt's infringement analysis and opinions regarding the Asserted Patents. (A3386, ¶ 5.)

Fivetech identified David A. Dornfeld, Ph.D. as an expert, and notified Southco that Dr. Dornfeld would "provide a report by the deadline established by the Court." (A3385, ¶ 3.) Fivetech, however, did not provide any expert report by the court-ordered deadlines. (A3386, ¶ 4.)

Following service of Dr. Pratt's expert reports, Fivetech engaged in substantial expert discovery, serving eighteen expert discovery document requests on Southco, including nine requests addressed to Dr. Pratt. (A3386, ¶ 7; A3461-3462.) Without an expert report from Dr. Dornfeld, Southco had no basis to seek expert discovery. Expert discovery closed on April 9, 2012. (A978.)

On May 21, 2012, approximately a month and a half after the close of expert discovery and two and a half months after the deadline for rebuttal reports, Fivetech filed its motion for summary judgment of noninfringement of the '012 Patent including, for the first time, an expert declaration from Dr. Dornfeld (the "Dornfeld Declaration"). The Dornfeld Declaration reports the results of previously undisclosed and undated experimental tests. Based on these tests, Dr. Dornfeld opined in his Declaration that the Accused Product includes a "radiused" edge and not an annular chamfer. (A3302-3306, ¶¶ 4, 6-8, 11, 12.) Fivetech's motion relied on that opinion and the undisclosed tests in support of its noninfringement arguments. (A3168-3170.)

Southco moved to strike the Dornfeld Declaration as untimely and prejudicial on June 1, 2012, arguing in part that it had had no opportunity to question Dr. Dornfeld about his methodology or qualifications. (A3378-3379.) In response, Fivetech admitted that it deliberately chose not to file its expert report by the court-ordered deadline. (A4082 ("the only basis for Southco's motion to strike

… must be on Fivetech's decision not to serve a rebuttal report in response to the infringement report of John D. Pratt, Ph.D.").) Fivetech explained that

> [i]n an effort to conserve time and costs … Fivetech elected not to prepare a rebuttal report from Dr. Dornfeld, since it was obvious that Southco would not be able to meet its burden.

(A4083.)

The district court granted Fivetech's motion for summary judgment on September 19, 2013. (A44.) In its memorandum, the court expressly adopted the expert opinion contained in the Dornfeld Declaration that the Accused Product includes radiused edges (and not chamfered edges), and on that basis, concluded that the Accused Product did not infringe claims 2-5 and 7-14 of the '012 Patent. (A37.)

The district court subsequently denied Southco's motion to strike on November 12, 2013. (A47.) In its order, the court acknowledged that

> … this Court granted Fivetech's motion for summary judgment of non-infringement of the '012 patent on September 19, 2013 …. In that opinion, the Court relied on the declaration of Dr. Dornfeld.

(A46.) The district court further found that

> [e]ven if Fivetech would have been more strictly in compliance with the Federal Rules of Civil Procedure and this Court's Scheduling Order … this Court finds that there was no prejudice to Southco by Fivetech not filing a rebuttal report because Southco had an opportunity to rebut Dr. Dornfeld's declaration in its

11

opposition to the motion for summary judgment on non-infringement.

(A47.)   The court did not address Southco's argument that Fivetech's untimely disclosure of Dr. Dornfeld's opinion prevented Southco from examining and questioning his methodology or qualifications.

### B.    Summary Judgment—'095 and '131 Patents

On July 11, 2011, Fivetech moved for summary judgment of noninfringement of claims 1-15 of the '095 Patent and claims 1-15 of the '131 Patent, arguing that the Accused Product does not meet the limitation of "the ferrule is slidably and rotatably attached to the knob" in the asserted claims of the '095 and '131 Patents.   (A1078-1080.)   Fivetech's argument was based on its position that the asserted claims require that the knob and ferrule be "attached as a single, non-detachable assembly."   (*See* A1079.)

As noted in Southco's response, Fivetech's motion relied on an unduly limited interpretation of the term "attached" that was contrary to the ordinary meaning of the term.   (*See* A1185-1187.)   Southco also argued that, even under Fivetech's proposed construction, the washer/ferrule arrangement in the Asserted Product meets the disputed limitation under the Doctrine of Equivalents.   (*See* A1195-1198.)

On January 24, 2012, the district court ruled in favor of Fivetech, construing the term "attached" to mean "directly" attached.   (*See* A11-16.)   The court based

its conclusion on a preferred embodiment of the '095 Patent, which the court noted includes direct contact between a flange on the ferrule and a flange on the knob. (*See* A14-15.)

The court concluded that no literal infringement existed because there was no direct attachment between the knob and ferrule in the Accused Product. (*See* A16-17.) It then found that there was no infringement under the Doctrine of Equivalents, because "[t]he Fivetech device uses a washer, which is entirely absent from the Southco patents." (A20.)

### C. Summary Judgment—'012 Patent

On May 21, 2012, Fivetech moved for summary judgment of noninfringement of claims 1-14 of the '012 Patent. (A3154.) For claims 2-5 and 7-14, Fivetech argued that the Accused Product did not include the claimed "annular chamfer." (*See* A3168-3170.) For claims 1, 6, 8-10, and 14, Fivetech argued that the Accused Product did not include protrusions that "rigidly secure" the screw head to the knob. (*See* A3172-3173.) Fivetech asserted that the phrase "rigidly secure" meant that the protrusions "must displace knob material." (*See* A3172-3173.)

In response to the first argument, Southco argued that the evidence produced by Fivetech confirmed that the screw heads include an annular chamfer. (*See* A3494-3496.) Southco also relied on its expert, Dr. Pratt, who opined that the

Accused Product included an annular chamfer based on the representative engineering drawings and other images of the product produced by Fivetech.  (*See* A3496; 3581-3586, ¶¶ 54-57.)  In response to the second argument, Southco noted that Fivetech's interpretation of "rigidly secure" improperly limited the claims to requiring "displacing" knob material.  (A3497-3498.)

On September 20, 2013, the district court ruled in favor of Fivetech.  (A44.)  Regarding Fivetech's first argument, the district court adopted the opinion of Fivetech's expert, Dr. Dornfeld, that the Accused Product includes a radiused, not chamfered, edge.  (*See* A37.)  The court then concluded without elaboration that "such [radiused] edges are not equivalents in form, function, or fabrication" to chamfered edges.  (A37.)  The court dismissed Southco's reliance on Fivetech's engineering drawings of the Accused Product, stating that an analysis of "pictures" of the accused product "does not assist in comparing the accused product against the patent claims."  (A38.)

Regarding Fivetech's second argument, the court accepted Fivetech's argument that the phrase "rigidly secure" in the product claims of the '012 Patent required "displacing" knob material.  (*See* A42-43.)  The court then referred to its previous ruling (with respect to method claims in the '095 Patent) that the process for creating the Accused Product did not cause "displacement" of knob material.

(*See* A43.)  On that basis, the court held that no reasonable jury could find infringement of this limitation in the product claims of the '012 Patent.  (*See* A43.)

### D.  Summary Judgment—Asserted Trademarks

On April 21, 2012, Fivetech moved for summary judgment of noninfringement of the Asserted Trademarks, arguing that it did not use the accused Segmented Circle Mark "in commerce."  (*See* A2701-2704.)  In response, Southco identified evidence of use in commerce including (i) Mr. Rabin's sworn declaration that the Segmented Circle Mark was used in commerce, (ii) Fivetech's offer to sell captive screws bearing the Segmented Circle Mark to SRI, and (iii) Fivetech's website advertisement of the 46 Series Catalogue Screws.  (A2863-2868; A2888-2890.)

On November 12, 2013, the district court concluded that

> neither Fivetech's website, product catalogue, nor price quotes to SRI can constitute 'use in commerce' of the [Segmented Circle] Mark.  None of these involved the [Segmented Circle] mark being sold or transported in United States commerce.

(A56.)  Regarding Mr. Rabin's declaration, the district court concluded "that no reasonable jury could find that Fivetech's [Segmented Circle] mark was used in United States commerce solely on the basis of the trademark application."  (A57.)

15

# SUMMARY OF THE ARGUMENT

The issues on appeal involve improper claim constructions, improper grants of summary judgment, and abuses of discretion by the district court.

The district court erroneously construed the term "attached" in the claims of the '095 and '131 Patents to require a "direct" attachment by reading into the claims a limitation from a preferred embodiment of the invention. Based on the intrinsic evidence, this term should not have been limited only to "direct" attachments.

The district court also erroneously construed the phrase "rigidly secure" by adding a "displacement" requirement that was not present in the claims. The intrinsic evidence does not support adding this "displacement" requirement to the asserted claims.

The district court erred by failing to construe in Southco's favor all facts and inferences relating to infringement. The court erroneously ruled on summary judgment that the Accused Product does not include an "annular chamfer." The court's ruling was adverse to the factual evidence and expert opinion presented by Southco on this issue.

The district court erred by failing to construe in Southco's favor all facts and inferences relating to infringement under the Doctrine of Equivalents. Southco's

motions included sufficient evidence that a jury could find the Accused Product to be equivalent to the claimed captive screws.

The district court erroneously denied Southco's motion to strike the untimely-disclosed Dornfeld Declaration. The admission of the Dornfeld Declaration resulted in prejudice that Southco was not given an opportunity to properly cure.

The district court erroneously concluded that Fivetech did not use its Segmented Circle Mark in commerce. The district court relied on the wrong definition for the term "use in commerce" and disregarded evidence that the mark had been used in commerce.

The above errors justify correcting the district court's construction of the disputed claim terms, reversing the grants of summary judgment of noninfringement of the Asserted Patents and Trademarks, and reversing the denial of Southco's motion to strike the Dornfeld Declaration.

## ARGUMENT

### I. STANDARD OF REVIEW

#### A. Claim Construction

Claim construction is a question of law, and is reviewed on appeal without deference. *Lighting Ballast Control LLC v. Phillips Electronics North America Corp.*, 744 F.3d 1272, 1283-84 (Fed. Cir. 2014) (*en banc*).

Although the specification is a valuable source for the meaning of claim terms, this Court has "consistently decline[d] to construe claims according to the preferred embodiment" found in the specification. *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005). "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim. For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

A court may depart from the plain meaning of a claim term only in two instances: lexicography and disavowal. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, No. 2013–1267, ___ F.3d ____, 2014 WL 1704518, at *2 (Fed. Cir. May 1, 2014). For lexicography, "a patentee must clearly set forth a definition of the disputed claim term, and clearly express an intent to define the term." *Id.* (internal quotations omitted). For disavowal, "the specification or prosecution history [must] make clear that the invention does not include a particular feature." *Id.* (internal quotations omitted).

## B.   Summary Judgment

The grant of summary judgment is also reviewed *de novo*. *Applied Medical Resources v. U.S. Surgical Corp.*, 448 F.3d 1324, 1331 (Fed. Cir. 2006). Judgment

is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). All ambiguous facts and reasonable inferences must be "construed in the light most favorable to the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where the parties draw different inferences from the same facts, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Summary judgment is thus inappropriate where there is disagreement between the parties' experts regarding issues of material fact. *See Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. Appx. 911, 921 (Fed. Cir. 2004).

### 1.     Patent Infringement

Summary judgment of noninfringement under the Doctrine of Equivalents is appropriate only when no reasonable jury could find equivalence. *See Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999) ("Whether a claim is infringed under the Doctrine of Equivalents may be decided on summary judgment only if no reasonable jury could determine that the limitation and the element at issue are equivalent."). This standard has been recognized as "a high hurdle which this court does not lightly attempt to surmount." *See Vehicular Tech. Corp. v. Titan Wheel Int'l Inc.*, 212 F.3d 1377, 1381 (Fed. Cir. 2000).

## 2. Trademark Infringement

Rulings regarding trademark issues are reviewed under regional circuit law. *Cortland Line Co., Inc. v. Orvis Co., Inc*., 203 F.3d 1351, 1361 (Fed. Cir. 2000). The Third Circuit reviews such rulings *de novo*. *E.T. Browne Drug Co. v. Cococare Products, Inc*., 538 F.3d 185, 191 (3d Cir. 2008) ("On appeal from a grant of summary judgment, our Court exercises the same standard of review as the District Court and considers whether genuine issues of material fact exist that preclude entry of summary judgment."). In the Third Circuit, the "[f]ailure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception." *Country Floors, Inc. v. Partnership Composed of Gepner and Ford*, 930 F.2d 1056, 1062–63 (3d Cir. 1991).

Section 32(1)(a) of the Lanham Act (15 U.S.C. § 1114(1)(a)) provides that any person who shall "***use in commerce*** any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, ***offering for sale***, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion …" shall be liable to the registrant. (Emphases added).

"Commerce" is used broadly by the Lanham Act and it means "all commerce which may be lawfully regulated by Congress." 15 U.S.C. § 1127;

*Steele v. Bulova Watch Co*., 344 U.S. 280, 283 (1952) (recognizing that the Lanham Act "confers broad jurisdictional powers upon the courts of the United States."); *see also United We Stand Am., Inc. United We Stand, Am. New York, Inc*., 128 F.3d 86 (2d. Cir. 1997) ("The history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause ….").

The "use in commerce" requirement for trademark infringement (Section 32) is necessarily different from the "use in commerce" requirement for trademark registrability (Section 45). For example, the Second Circuit has held that the Section 45 definition of "use in commerce" "***cannot apply to the infringement sections***" of the Lanham Act. *Rescuecom Corp. v. Google, Inc*., 562 F.3d 123, 131-41 (2d. Cir. 2009) (concluding further that the Lanham Act "employs the term 'use in commerce' in two very different contexts" and that liability for trademark infringement cannot require an accused infringer to have made "bona fide use of the mark in the ordinary course of trade, and not merely to reserve a right in a mark" as defined by Section 45) (emphasis added).

## C. Evidentiary Rulings

Evidentiary rulings by a district court are reviewed under regional circuit law. *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc*., 265 F.3d 1294, 1308 (Fed. Cir. 2001). A district court's decision to admit or deny expert testimony is

reviewed for abuse of discretion. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[A] court of appeals is to apply an abuse-of-discretion standard when it review[s] a trial court's decision to admit or exclude expert testimony" (internal quotations and citations omitted)). "A district court by definition abuses its discretion when it makes an error of law." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)).

A party intending to rely on the testimony of an expert witness must produce a written expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i). The purpose of this rule is "to convey the substance of the expert's opinion … so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1374 (Fed. Cir. 2012) (citing *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)).

FED. R. CIV. P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." This "self-executing sanction" is intended to provide "a strong inducement for

disclosure" of material that the disclosing party would expect to use as evidence, whether at trial, at a hearing, or on a motion "such as one under Rule 56." FED. R. CIV. P. 37(c)(1) advisory committee's notes to 1993 amendment; *see also Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc*., 272 F.R.D. 350, 359 (W.D.N.Y. 2011) ("If the Federal Rules of Civil Procedure are to be effective and meaningful, parties should not be permitted to conceal potential sources of responsive information in the hope that the opposing party does not discover their deliberate omission until the discovery deadline has expired.").

In determining whether a party's failure to provide information required by Rule 26(a) or (e) was "substantially justified" or "harmless," the Third Circuit requires a court to consider the following factors (the "*Pennypack* factors"):

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order.

*In re TMI Litig*., 193 F.3d 613, 721 (3d Cir. 1999) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977)). Subsequent cases have also looked at the evidence sought to be excluded as a fifth factor. *See ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 298 (3d Cir. 2012).

## II.   THE DISTRICT COURT ERRED BY MISCONSTRUING TERMS IN THE CLAIMS OF THE '095, '131, AND '012 PATENTS

### A.   The district court erred by misconstruing the term "attached" in the asserted claims of the '095 Patent and '031 Patent to mean "directly" attached

#### 1.   The intrinsic evidence supports Southco's proposed construction of the term "attached"

Claims 1, 4, 7, 10, and 13 of the '095 Patent and claims 9 and 14 of the '131 Patent recite that "the ferrule is slidably and rotatably attached to the knob." The ordinary and customary meaning of "attached" encompasses both direct and indirect attachments.

The word "attached" has the ordinary meaning of "connected" or "joined." (*See* A1280, ¶ 15; A1368-1370.)  The ordinary meaning of the word includes no requirement that the attachment be direct, or that the attached components directly contact one another.  (A1280, ¶ 15.)  The mere fact that the phrases "directly attached" and "indirectly attached" have meaning demonstrates that the word "attached," when used on its own, is not limited to one manner of attachment or the other.

The claims support this ordinary meaning.  Claim 1, for example, places no restrictions on the form of the structure that attaches the knob and ferrule.  There is no language in claim 1 that limits the term "attached" to requiring any particular structure for effecting the attachment.  Instead, the claims provide context to the meaning of "attached" by describing the effect of the attachment.  Claim 1 recites

that the attachment relationship between the ferrule and the knob "prevents the ferrule and the knob from separating." As such the claim language requires only that the knob and ferrule be prevented from separating, which can be accomplished through either a direct or an indirect attachment. From the language in the claims, one of ordinary skill in the art would have no reason to understand the claim term "attached" to require any specific type of attachment. (*See* A1278-1279, ¶ 13.)

The specification also supports the ordinary meaning by using the word "attached" to cover both direct and indirect attachments. Three examples are included below:

- Direct attachment: "the screw head 24 is rigidly ***attached*** to the knob 30" (*see* A4549, col. 3, lines 35-37);

- Indirect attachment: "[t]he screw is ***attachable*** to the first panel" (*see* A4548, col. 1, lines 36-37); and

- Indirect attachment: the screw "is used for ***attaching*** the first panel to a lower surface … having a threaded hole" (*see* A4548, col. 1, lines 37-38).

In the first example, the screw head 24 directly contacts the knob 30 to effect the attachment. In the second example, the screw does not contact the first panel, but instead is attached to the first panel indirectly, via the knob and ferrule. In the third example, the first panel is also attached to a lower surface indirectly, via the

25

screw, knob, and ferrule.   The specification thus uses variations of the word "attached" regardless of whether the attachment is achieved directly or indirectly through contact with other components (*i.e.*, the knob and ferrule).   Nothing in the specification sets forth a definition for "attached" contrary to its ordinary meaning.

The intrinsic evidence thus supports a construction of the term "attached" according to its ordinary and customary meaning, namely, encompassing both direct and indirect attachments.   Nothing in the intrinsic evidence supports construing the term "attached" to require direct attachments.

### 2.   The district court improperly limited its construction to one of the preferred embodiments in the specification

As noted by the district court, "neither party suggests that those of ordinary skill in the art in question understand the term ["attached"] any differently than its common meaning."   (A11-12.)   Fivetech did not dispute Southco's description of the ordinary meaning of the term "attached" in its briefing, or provide an alternative definition of the term's ordinary meaning.

The court, however, departed from the "ordinary and customary meaning" analysis required by *Phillips*, declaring that "[i]t is clear from the plain language of the claim that the ferrule is attached by direct interaction with the knob."   (A14.)   The court did not identify what "plain language" mandated limiting the claim to only "direct" connections, nor did it provide any basis in the claims for departing from the ordinary meaning of "attached."

26

Without citing specific claim language, the district court proceeded directly to "the patents' preferred embodiment." (A14.) The court noted that one of the preferred embodiments includes "a capture mechanism in which the knob and ferrule directly connect." (A14.) While there is direct contact between the knob and the ferrule in the one position shown in FIG. 2, the specification does not limit the meaning of the word "attached" to that (or any) preferred embodiment. The specification states: "the knob 30 is attached to the ferrule 50, however, full rotational movement of the knob 30 with respect to the ferrule 50, and a limited amount of axial movement of the knob 30 with respect to the ferrule 50 … are provided." (*See* A4549, col. 4, lines 62-67.) Nowhere does the specification suggest that these functional effects of the attachment features could only be achieved via a direct attachment between the knob and ferrule.

The district court erred in its construction by over-relying on the specific structural features of a preferred embodiment. By requiring a specific type of attachment from the specification, the court improperly imported a limitation of a preferred embodiment into the claim, even though the claim included language that was broader than that preferred embodiment. *See Superguide*, 358 F.3d at 875. The court's ruling contravenes the express instruction in the '095 Patent that "this invention is not limited to the particular embodiments disclosed, but is intended to

27

cover all modifications which are within the scope and spirit of the invention as defined by the … claims." (*See* A4550, col. 5, lines 60-67.)

The court concluded that construing "attached" to cover "indirect" attachments "reads out of the patent the way in which the Southco claimed invention actually captures the screw: using a direct connection …." (A15.) Not only is this conclusion incorrect, it is still improperly tied to a preferred embodiment. Nowhere in the specification did the patentee disavow coverage of "indirect" attachments, or expressly define the term "attached" to exclude "indirect" attachments. *See GE Lighting*, 2014 WL 1704518, at *2. The proper construction of "attached" encompasses both direct and indirect attachments.

The lower court's construction of the term "attached" improperly reads limitations from a preferred embodiment into the claims. As such, that construction is erroneous.

> ### 3. The district court failed to provide any separate construction or analysis of the term "engaged" in the '131 Patent

Instead of reciting slidably and rotatably "attached," claim 1 of the '131 Patent recites that the ferrule and knob are slidably and rotatably "engaged." The same reasoning supporting the construction of the term "attached" in the '095 Patent and '131 Patents supports a similar construction of the term "engaged," namely, that it is not limited to the exemplary embodiments and covers both direct

28

and indirect engagements.  The intrinsic evidence of the '131 Patent supports that construction and does not provide any reason to limit the term "engaged" to direct engagements.

The district court provided no separate analysis or holding for this term from its analysis of the term "attached."  As such, the district court's errors in construing that term equally infect its construction of this term.

### 4. The district court's improper construction of the term "attached" was the direct cause of its improper grant of summary judgment

The district court's improper construction of the term "attached" constitutes reversible error because that construction formed the only basis for its grant of summary judgment of noninfringement of claims 1-15 of the '095 Patent and claims 1-15 of the '131 Patent.  In its analysis regarding noninfringement, the court focused exclusively on the connection between the knob and ferrule in the Accused Product and asserted that the evidence relied on by Southco "does not address the way in which the knob and ferrule are ultimately joined in the device."  (A16-17.) The district court stated that "other descriptions of the series 46 screw show that the knob and ferrule are not connected to one another," and on that basis, held that there was no genuine dispute of material fact regarding infringement.  (A17.)

Because the district court's construction of the "attached" limitation was in error, its summary judgment ruling based on that construction is also in error and warrants reversal.

**B.    The district court erred by misconstruing the phrase "rigidly secure" in the asserted claims of the '095 Patent and '031 Patent to include an additional "displacement" requirement**

**1.    The intrinsic evidence does not support adding a "displacement" limitation to the claims**

Claims 1, 6, 8, and 14 of the '012 Patent recite "protrusions" that "rigidly secure said head portion to said inner surface of said knob." The parties do not dispute that the ordinary meaning of the phrase "rigidly secure" does not require "displacing" material. Instead, the district court reached such a construction in error by again importing specific limitations from a preferred embodiment.

The ordinary meaning of the phrase "rigidly secure," as understood by one of ordinary skill in the art, is "that the two parts in question, in this case the screw head and the knob, are attached to one another such that the assembly of the two parts behaves as a single rigid body." (A3554, ¶ 9.) The ordinary meaning of "rigidly secure" does not include any requirement that one of the two parts must displace the material of the other part in effecting the rigid securement.

The plain language of the claims of the '012 Patent supports this ordinary meaning and lacks any express or implicit requirement that the protrusions must "displace" knob material. The improper displacement limitation is instead drawn

30

from the method claims of the '095 Patent. The absence of that limitation from the '012 Patent claims demonstrates the patent owner's intent for the '012 Patent claims to have a different meaning and scope than the '095 Patent's method claims. *See Comark Commc'ns, Inc. v. Harris Corp*., 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims" of the same patent or patent family).

The specification also does not modify the meaning of "rigidly secure." The specification does explain that, in a preferred embodiment, screw 20 is rigidly secured to the knob 30 by displacing the knob material with protrusions 26. (*See* '012 Patent, col. 3, lines 33-38.) Nowhere, however, does the specification suggest that displacing knob material is the only way the screw and knob can be rigidly secured, or that such displacement is mandatory to effect the rigid securement.

To the contrary, the '012 Patent contemplates other ways of rigidly securing the screw and knob to one another. For example, claim 6 of the '012 Patent recites that the protrusions may "matingly engag[e] said inner surface of said knob" to effect the rigid securement. A mating engagement does not require the displacement of knob material. It allows for an embodiment where the protrusions engage with mating structures (*e.g.*, recesses) on the inside surface of the knob.

31

Nothing in the record supports the addition of a "displacement" limitation to the claims of the '012 Patent. The phrase "rigidly secure" requires no construction beyond its ordinary and customary meaning to one of ordinary skill in the art.

### 2. The district court improperly imported the features of one of the preferred embodiments into the claims

In construing this limitation of the '012 Patent, the district court asserted that the phrase "rigidly secure" was "not defined in the claims or in the specification." (*See* A42.) The court is correct that the '012 Patent does not attempt to define the phrase "rigidly secure." The term is used according to its ordinary meaning. Rather than applying this ordinary meaning, the court proceeded to an analysis of how "rigidly secure" is defined by a preferred embodiment of the '012 Patent. (*See* A42.)

The court acknowledged Southco's argument that the displacement limitation "is a limitation that does not appear in the claims, and to read the claims as containing the word 'displaced' would violate claim construction principles." (A42.) Nevertheless, the court did exactly that in reaching its decision, while providing no explanation as to how it was not violating claim construction principles.

The court based its construction on its previous factual finding, with respect to the method claims of the '095 Patent, that "no reasonable jury could find that Fivetech's process includes displacing knob materials." (*See* A43.) The claim at

issue in that previous decision (claim 16 of the '095 Patent) expressly recited a step of "displacing knob material," unlike the claims of the '012 Patent.

The district court then adopted Fivetech's construction:

> Based on this conclusion, it is logical that no reasonable jury could find that the Series 46 screws contain a plurality of protrusions to rigidly secure a screw to the inner surface of a knob by displacing that knob material. As discussed above, the term "displace" can be used to describe how the knob material interacts with the screw head, and the Court's earlier opinion that no displacement of knob materials occurs in the Series 46 screws is dispositive.

(A43.) The court did not explain why the claims required that the protrusions "rigidly secure a screw to the inner surface of a knob by displacing that knob material," aside from its brief discussion of a preferred embodiment of the '012 Patent.

As it did with the term "attached," the district court erred by relying on the specific features of a preferred embodiment to interpret the claims. By adding the "displacement" limitation to the '012 Patent claims, the court improperly imported a limitation of a preferred embodiment into the claim, despite the claim's use of language that was broader than that preferred embodiment. *See Superguide*, 358 F.3d at 875. Likewise, the patentee did not expressly redefine the term "rigidly secure" to require displacement of material. *See GE Lighting*, 2014 WL 1704518, at *2.

Southco submits that the lower court's construction of the phrase "rigidly secure" improperly read into the claims limitations from a preferred embodiment. As such, that construction should be rejected by this Court.

### 3. The district court's improper construction of the phrase "rigidly secured" was the direct cause of its improper grant of summary judgment

The district court premised its grant of summary judgment of noninfringement of claims 1, 6, 8-10, and 14 of the '012 Patent exclusively on its previous factual finding that the protrusions in the Accused Product did not "displace" knob material. This previous finding is not relevant to the question of infringement under the proper construction of the phrase "rigidly secure." Thus, the district court's improper construction of "rigidly secured" was the direct cause of its improper grant of summary judgment of noninfringement of the claims of the '012 Patent, and warrants reversal.

### C. The district court erred by misconstruing the phrase "fills the chamfer" in the asserted claims of the '012 Patent to include the additional "displacement" requirement

Claims 2, 4, and 11 of the '012 Patent recite an "annular chamfer," and that "material from said knob fills said chamfer." The '012 Patent explains that this structure helps to "hold[] the screw head 24 to the knob 30." (*See* A4575, col. 3, lines 60-65; *see also* A3589, ¶ 62 ("[t]he '012 patent makes it clear that the

chamfer provides a space filled with knob material which acts to help rigidly secure the knob to the screw)).

The district court made the same error in construing this phrase of the '012 Patent as it did in construing the term "rigidly secure," by improperly importing the "displacement" requirement into these claims as well.

As with the phrase "rigidly secure," there is no dispute that the ordinary meaning of the phrase "material from said knob fills said chamfer" does not require that the screw head "displace" the knob material. Nonetheless, the court did not construe the term according to its ordinary meaning. Instead, it explicitly based its addition of the displacement limitation on the features of a preferred embodiment: "[a]lthough the word 'displace' is not used in the patent claims or specification with relation to the chamfer, that term is used in the preferred embodiment of the patent." (A40.) After adding a requirement of "displacement" to the claims, the court asserted that its "earlier opinion … that no displacement of knob materials occurs in the [Accused Product] is dispositive." (A41.)

For the same reasons set forth above with respect to the phrase "rigidly secure," the district court's construction of the phrase "material from said knob fills said chamfer" improperly reads into the claims the "displacement" feature found in a preferred embodiment. Because the district court relied on that construction in deciding the question of infringement (as laid out in more detail in

35

Section IV(B)), its grant of summary judgment of noninfringement of claims 2, 4, and 11 of the '012 Patent also warrants reversal.

## III. THE DISTRICT COURT ERRED IN ITS ANALYSIS OF THE DOCTRINE OF EQUIVALENTS WITH RESPECT TO THE ASSERTED CLAIMS OF THE '095 PATENT AND '031 PATENT

Upon finding that there was no literal infringement under its construction of the term "attached" in the claims of the '095 and '131 Patents, the district court then concluded that the Doctrine of Equivalents could not be satisfied because "the 'all elements' test is not met in this case." (A19.) It did not properly apply the "all elements" rule, however, and did not properly consider the evidence provided by Southco regarding the presence of every element of the claims in the Accused Product. *See AFG Indus. Inc. v. Cardinal IG Co., Inc.*, 375 F.3d at 1371 (2004); *Zelinski*, 185 F.3d at 1317.

### A. The district court erred by misapplying the law regarding the Doctrine of Equivalents

The district court determined in its opinion that the "all elements" rule was violated because the attachment between the knob and ferrule required by the claims was absent in the Accused Product. (*See* A19-20.) Its reasoning, however, was based on hypothetical modifications to both a preferred embodiment of the '095 Patent and the Accused Product:

> [I]f the knob were broken on the Southco device described in the patents, the screw would not be held in the ferrule. By contrast, if the knob was broken from the

36

series 46 screws, the screw would still be held in place in
the ferrule.

(A20.)  This analysis improperly applies the "all elements rule."  The "all elements

rule" obligates a court to focus on the actual limitations in the asserted claim (as

opposed to a preferred embodiment), and the actual elements of the Accused

Product (as opposed to a hypothetical modification).  *See e.g. Lockheed Martin*

*Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003).

Inasmuch as the limitations of the asserted claims require that the knob be "rigidly

secured" to the head portion of the screw, the hypothetical situation discussed by

the court inherently departs from the scope of the claims.

The court further erred by basing its decision on elements in the Accused

Product not present in the asserted claims.  In particular, the district court noted

that "[t]he Fivetech device uses a washer, which is entirely absent from the

Southco patents," and that "[t]his additional piece of equipment is not an

insubstantial change to the Southco patents."  (A20.)  This reasoning misapplies

the infringement analysis; it is the claim limitations that must be applied to the

Accused Product, and not *vice versa*.  *See Lockheed,* 324 F.3d at 1321.  The fact

that the Accused Product includes features "absent from the Southco patents"

cannot defeat a finding of infringement (either literally or under the Doctrine of

Equivalents) if the product nonetheless includes all limitations of the claims.  *See*

*CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (noting

37

that the presence of additional, noninfringing elements in a product does not negate infringement).

The district court's misapplication of the "all elements" rule formed the basis for its grant of summary judgment on this issue, and warrants its reversal.

### B. The district court erred by not properly considering the evidence provided by Southco showing a genuine issue of fact regarding whether the Accused Product is equivalent to the asserted claims

In its briefing, Southco presented substantial evidence that the attachment in the Accused Product was at least equivalent to that recited in the claims of the '095 and '131 Patents. Claim 1 recites that the attachment is "slidabl[e] and rotatabl[e]," and that the attachment "prevents the ferrule and the knob from separating." (A4550, col. 6, lines 26-30.) Both Fivetech and the district court acknowledged that the structure in the Accused Product corresponding to this claim limitation is the combination of the washer and the flange on the ferrule (the "washer/flange engagement"). (*See* A1073; A19-20.) The parties do not dispute that the washer/flange engagement allows the ferrule to slide and rotate relative to the knob and prevents the ferrule from separating from the knob. (*See* A1073-1074; A1279-1281, ¶¶ 14 and 18.) From this undisputed evidence, a jury could find that the washer/flange engagement meets the requirements of the Function-Way-Result test; it performs substantially the same function (*i.e.*, limiting axial movement of the ferrule) in substantially the same way (*e.g.*, using a flanged

38

surface on the ferrule) to achieve substantially the same result (*i.e.*, preventing separation of the ferrule and knob) as that required by the attachment recited in the claims of the '095 Patent. (*See* A1195-1196.)

Additionally, the washer/flange engagement in the Accused Product was a known interchangeable structure at the time of the filing of the accused patent. Southco's expert Dr. Pratt testified that the washer/flange engagement in the Accused Product and the prior art and the attachment structure described in a preferred embodiment of the '095 Patent "were well known in the art as being interchangeable" and that "one of ordinary skill in the art would have viewed the differences between the two types of captivation structures as insubstantial." (A1285, ¶ 24.)

The district court's opinion regarding the Doctrine of Equivalents includes no mention of the above evidence offered by Southco. At a minimum, this evidence creates a genuine issue of material fact as to whether the washer/flange engagement was substantially different from the claimed attachment structure, or whether the two structures are interchangeable. The absence of any consideration of this evidence in the district court's opinion highlights its failure to resolve all facts and inferences in the light most favorable to Southco, as it was required to do on Fivetech's motion for summary judgment. *See Anderson*, *supra*, at 19.

When the evidence presented is viewed in the light most favorable to the non-movant, a genuine issue of fact exists regarding the applicability of the Doctrine of Equivalents. As such, reversal of the district court's grant of summary judgment of no infringement under the Doctrine of Equivalents is justified.

## IV. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE '012 PATENT

### A. The district court erred by ruling there was no genuine issue of fact regarding the presence of an "annular chamfer" in the Accused Product

Claims 2, 4, 7, and 11 of the '012 Patent recite that the head portion of the screw includes an "annular chamfer" peripheral to its bottom surface. Fivetech did not dispute that the Accused Product includes an angled lower edge on the circular screw head; it disputed only whether that angled lower edge is a straight "chamfered" edge or a curved "radiused" edge.

During summary judgment, Southco produced images of the Accused Product and expert opinion supporting its position that the Accused Product includes the claimed annular chamfer. (*See* A3495-3496.) Dr. Pratt's opinion was specifically based on (1) photographs of a cross-section of the Accused Product, (2) representative engineering drawings of the Accused Product produced by Fivetech, and (3) diagrams of the manufacturing process of the Accused Product created by Fivetech. (*See* A3580-3586, ¶¶ 47-57.) In particular, the representative engineering drawings and the diagrams produced by Fivetech show a straight,

40

chamfered edge, and were unrebutted by Fivetech. Dr. Pratt's testimony and the underlying images, at a minimum, create a genuine issue of material fact as to the presence of a chamfer in the Accused Product that is required to be resolved in Southco's favor on summary judgment.

The photographs of the Accused Product relied on by Dr. Pratt were photos of the same sample used by Fivetech's expert, Dr. Dornfeld, in rendering his own untimely opinion. One of those photos (reproduced below) shows the screw of the Accused Product having the chamfered lower edge, identified by Dr. Pratt.



(A3582, FIG. 2.) The red line in the above photo, added for clarity, shows the line of the annular chamfer in the Accused Product. From this and other photos produced by Dr. Dornfeld, Dr. Pratt affirmed that the bottom edges of the screw in the Accused Product are, in fact, chamfered. (A3582-3583, ¶ 53.)

**CONFIDENTIAL MATERIAL OMITTED**

[

]

Finally, Fivetech also prepared and produced numerous diagrams showing the features of the Accused Product. A pair of such diagrams are reproduced below, with arrows added to identify the chamfers.



(A3584-3585, FIGS. 3-4.)

In addition to his opinion regarding the presence of the annular chamfer in the Accused Product, Dr. Pratt also explained that the testing performed by Dr. Dornfeld was inadequate and could have altered the sample. Dr. Pratt pointed out that Dr. Dornfeld failed to flood the sample with coolant while sawing the sample, which would have prevented melting or distortion of the sample. (*See* A3580-3581, ¶ 48.) Dr. Pratt further opined that the "radiused" edges alleged by Dr. Dornfeld to appear in certain photos were instead burrs formed in the sample by

43

Dr. Dornfeld's sawing, which should properly have been removed by sanding and polishing the sample. (*See* A3581, ¶¶ 49-51.) Because the Dornfeld Declaration was belatedly and improperly produced (as discussed *infra* at Section V), Southco was denied the opportunity to question Dr. Dornfeld about the testing and the problems identified by Dr. Pratt.

The district court failed to properly construe the above evidence and facts in Southco's favor, as it was required to do. With respect to the images reviewed by Dr. Pratt, it asserted without explanation that "analyzing those pictures does not assist in comparing the accused product against the patent claims." (A38.) This assertion is incorrect and is itself a factual ruling against Southco. There is no legal restriction on the use of images of an accused product, and in particular engineering drawings considered by an expert, to show or corroborate an expert opinion regarding the presence of a claimed feature in the accused product. *See Freeman v. Gerber Products Co.*, 388 F. Supp. 2d 1238, 1245 (D. Kan. 2005) (denying summary judgment of noninfringement due to a genuine issue of material fact raised by "an examination of the engineering drawings"); *Afros S.p.A. v. Krauss-Maffei Corp.*, 671 F. Supp. 1402, 1434-36 (D. Del. 1987) (using expert testimony based on engineering drawings to support a finding of infringement).

The particular photographs reviewed by Dr. Pratt showed the same product reviewed by Dr. Dornfeld, and at a minimum constitute facts in dispute that must

be resolved in Southco's favor. Moreover, the engineering drawings reviewed by Dr. Pratt were specifically produced by Fivetech in response to the court's requirement that Fivetech produce "a representative engineering drawing of the [Accused Product]." Neither Fivetech nor its expert Dr. Dornfeld stated that the drawings that Fivetech produced, which show a chamfer, are not representative of the Accused Product.

The district court further improperly disregarded Dr. Pratt's opinions regarding the problems with Fivetech's testing. Despite the fact that Dr. Dornfeld's testing was revealed well after the close of expert discovery, the district court criticized Dr. Pratt's analysis of the problems in that testing as being "conclusory" and "not supported by any evidence in the record." (*See* A38-39.) Southco, however, was given no opportunity to question Dr. Dornfeld's conclusions and testing, or develop separate evidence regarding Dr. Dornfeld's improper testing, due to the intentional untimeliness of the Dornfeld Declaration.

The images of the Accused Product and representative drawings produced by Fivetech and the opinions of Dr. Pratt are more than enough for a jury to find that the Accused Product includes an annular chamfer. As such, a genuine issue of fact exists regarding the claimed chamfer, particularly when the evidence is viewed in the light most favorable to the non-movant. The district court's grant of

summary judgment of no infringement of claims 2-5 and 7-14 of the '012 Patent

was in error and warrants reversal.

**B.    The district court erred by ruling there was no genuine issue of fact as to whether the knob material in the Accused Product "fills said chamfer"**

In addition to reciting the "annular chamfer," claims 2, 4, and 11 of the

'012 Patent recite that "material from said knob fills said chamfer."    The

'012 Patent explains that this structure promotes the rigid attachment of the screw

to the knob.    (*See* A4574, col. 1, lines 62-67; *see also* A3589, ¶ 62 ("[t]he `012

patent makes it clear that the chamfer provides a space filled with knob material

which acts to help rigidly secure the knob to the screw").).

The same evidence relied on by Southco to show the presence of a chamfer

also shows that the Accused Product includes knob material that fills the chamfer.

In particular, Figures 11 and 12 of the Dornfeld Declaration show the knob

material extending into the area created by the annular chamfer.    (A3302-3306,

¶¶ 4, 6-8, 11, 12.)    Likewise, the pair of diagrams of the Accused Product produced

by Fivetech show how knob material extends into the area created by the chamfer,

and in fact covers the chamfered edge of the screw.    (*See* A3584-3585, FIGS. 3-4.)

Reviewing these figures and diagrams, Dr. Pratt opined that the chamfer in the

Accused Product "create[s] a space that is filled with plastic knob material to help

rigidly secure Fivetech's knob to the screw head."    (A3589, ¶ 63.)

The district court, however, again failed to properly construe the evidence in favor of Southco, the non-moving party. The court rejected Southco's infringement argument on the grounds that the analysis of such diagrams "does not involve any comparison of the accused product to the claims of the patent." Instead, the district court asserted that this feature was not present in the Accused Product on the grounds that no "displacement" of knob material occurred (as discussed *supra*).

For the same reasons discussed above with respect to the annular chamfer, the district court did not consider the evidence provided by Southco that the Accused Product includes knob material that fills the chamfer in the light most favorable to Southco. The diagrams of the Accused Product produced by Fivetech and the opinions of Dr. Pratt based on those diagrams demonstrate a genuine issue of material fact regarding this limitation, and warrant reversal of the district court's grant of summary judgment of no infringement of the '012 Patent.

### C. The district court erred by failing to conduct a proper analysis under the Doctrine of Equivalents

After determining that the Accused Product did not literally infringe the asserted claims, the court addressed the Doctrine of Equivalents in a single sentence: "[b]ecause the Series 46 screws have radiused edges rather than chamfered edges, and such edges are not equivalents in form, function, or fabrication, the screws also cannot infringe those claims under a doctrine of

equivalents theory." (*See* A37.) It did not identify the alleged function of the "radiused edges" or how such a function was not equivalent to the function of the chamfer in the claims of the '012 Patent.

Contrary to the district court's lone statement, Southco provided evidence demonstrating that regardless of whether the angled lower edge is "radiused" or "chamfered," it performs the same function in the same way to achieve the same result as that contemplated in the '012 Patent. Southco's expert, Dr. Pratt, identified the function of the "chamfer" in the '012 Patent as "provid[ing] a space filled with knob material which acts to help rigidly secure the knob to the screw." (*See* A3589, ¶ 62.) Dr. Pratt then opined that the angled lower edge in the Accused Product performs the same function: "[t]here is no question that the [lower edge of the Accused Product] does have a function and that function is to provide a space to be filled with knob material to help rigidly secure the knob to the screw." (A3589-3590, ¶ 64.)

Since the angled (or "radiused" under the court's conclusion) lower edge of the Accused Product and the chamfered edge of the claims contact the knob material in the same way, they necessarily perform that function in the same way (*i.e.* through contact with the knob material), and achieve the same result (*i.e.*, rigid securement of the knob to the screw). A jury could have found from this evidence

that the angled lower edge of the Accused Product meets the requirements of the Function-Way-Result test.

The district court's opinion regarding the Doctrine of Equivalents includes no analysis of the chamfer feature under the Function-Way-Result test, and no mention of Dr. Pratt's opinion. The absence of any such analysis shows that the court failed to resolve all facts and inferences in the light most favorable to Southco, as it was required to do. *See Anderson*, *supra* at 19.

When all facts and inferences are resolved in the light most favorable to the non-movant, a genuine issue of fact exists regarding the applicability of the Doctrine of Equivalents to this feature of the '012 Patent, justifying reversal of the district court's grant of summary judgment of no infringement under the Doctrine of Equivalents.

## V. THE DISTRICT COURT ERRED BY FAILING TO EXCLUDE THE DORNFELD DECLARATION PURSUANT TO FED. R. CIV. P. 26 AND 37.

The Dornfeld Declaration is an untimely and improper rebuttal expert report of Dr. Pratt's opening expert report. Dr. Pratt, in his opening expert report, opined that the Accused Product included "an annular chamfer peripheral to said annular bottom surface of said head portion" as recited by the asserted claims of the '012 Patent. (*See, e.g.,* A3441.) The Dornfeld Declaration includes expert testing, analysis, and opinion regarding this claim limitation, and reaches a result contrary

to Dr. Pratt. Accordingly, Fivetech should have served the Dornfeld Declaration on Southco "[n]o later than March 6, 2012." (A977-978.)

Fivetech did not do so. Instead, Fivetech submitted the Dornfeld Declaration (including Dr. Dornfeld's test results) in conjunction with its summary judgment motion, more than a month after the close of expert discovery and more than two months after the deadline for rebuttal expert reports. By doing so, Fivetech prevented Southco from engaging in any expert discovery, including cross examining Dr. Dornfeld regarding his testing, analysis, and opinions. The district court subsequently denied Southco's motion to strike, and expressly relied upon the Dornfeld Declaration in granting Fivetech's motion for partial summary judgment of noninfringement of the '012 Patent. (A46.) The district court abused its discretion in admitting and relying upon the Dornfeld Declaration and on this basis, the grant of summary judgment should be reversed.

### A. The district court erred by failing to consider all of the *Pennypack* factors

The district court's first error was not considering *Pennypack* and all five of the *Pennypack* factors in denying Southco's motion to strike the Dornfeld Declaration. (*Id.*) Specifically, the district court considered only the prejudice of the Dornfeld Declaration to Southco and Southco's ability to cure that prejudice. (*Id.*) The district court, however, disregarded *Pennypack* factors (3)-(5), namely:

50

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court;

(4) bad faith or willfulness in failing to comply with the district court's order; or

(5) the importance of the excluded evidence.

*See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 720  (3d Cir. 1997).

The district court's failure to consider all of the required *Pennypack* factors in admitting this prejudicially late and unvetted evidence over Southco's objection is an error of law that constitutes an abuse of discretion.  *See In re TMI Litig*., 193 F.3d at 721 (3d Cir. 1999) ("In *Pennypack*, we listed certain factors which must be considered in evaluating whether the District Court properly exercised its discretion."); *see also In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 312 ("A district court by definition abuses its discretion when it makes an error of law.").

## B. The proper application of the Pennypack factors requires exclusion of the Dornfeld Declaration

A proper application of all five of the *Pennypack* factors would have resulted in the exclusion of the Dornfeld Declaration, demonstrating that the district court's decision otherwise constituted an abuse of discretion.

51

### 1. The district court erred in concluding that Southco was not prejudiced by the Dornfeld Declaration

Fivetech did not serve the Dornfeld Declaration until well after the deadline for serving expert reports and the close of expert discovery.  In doing so, Fivetech deprived Southco of any discovery relating to the Dornfeld Declaration, including the ability to review Dr. Dornfeld's test testing/test results and to cross-examine Dr. Dornfeld regarding his testing, analysis, or opinions.

Had Fivetech timely served the Dornfeld Declaration during expert discovery, Southco would have cross-examined Dr. Dornfeld regarding whether his testing, analysis, and opinions are the product of reliable principles and methods.  *See Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 592 (1993). (requiring that an expert's methodology "have a reliable basis in the knowledge and experience of his discipline.").  Cross-examination of exactly this type is necessary to make certain that an "expert's opinion [is] based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"  *Calhoun v. Yamaha Motor Corp. U.S.A*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *In re Paoli R.R. Yard PCB Litig*., 35 F.3d 717, 742 (3d Cir. 1994) (quoting *Daubert*, 509 U.S. at 590)).

For example, Southco would have cross-examined Dr. Dornfeld regarding whether his testing method did or could have created the "radiused edges" that Dr. Dornfeld opined did not meet the "chamfer" limitation recited by the '012 Patent.

52

Southco's expert opined that Dr. Dornfeld's methodology, which involved the use of an abrasive cutoff saw to "section" Fivetech's captive screw, resulted in distortions known as "burrs" because Dr. Dornfeld apparently did not cool the captive screw during the sectioning process. (A3580-3581, ¶¶ 47-51.) Nor did Dr. Dornfeld apparently use sand and polish media to remove burrs. (A3580- 3581, ¶¶ 48, 50.) Thus, according to Dr. Pratt, Dr. Dornfeld's methodology destroyed the chamfered surfaces of the captive fasteners, resulting in burrs that Dr. Dornfeld opined demonstrated a "radiused edge" on Fivetech's captive fasteners. (A3581, ¶ 50.)

Southco did not have the opportunity to question Dr. Dornfeld about the inconsistency between his opinion in his declaration and the engineering drawings and diagrams provided during discovery that show a chamfer and not a radiused edge. Southco did not have the opportunity to question Dr. Dornfeld about the equivalence of a chamfer and a radiused edge in the Accused Product. The prejudice from these lost opportunities was not cured merely by allowing Southco to submit a responsive expert declaration.

Ultimately, the burden of establishing the admissibility of the Dornfeld Declaration falls on Fivetech. *See Extreme Networks, Inc. v. Enterasys Networks, Inc.*, Nos. 09-1325, 1346, 2010 WL 3862902, at *5 (Fed. Cir. 2010). By producing the Dornfeld Declaration after the close of expert reporting and discovery, Fivetech

53

deprived Southco of the ability to explore whether Fivetech can carry this burden with respect to the Dornfeld Declaration. The court's admission of the untimely Dornfeld Declaration has, in effect, insulated Dr. Dornfeld from the admissibility challenges based on *Daubert* and *Kumho* as set forth above.

Courts in the Third Circuit have found the exact type of behavior displayed by Fivetech to be prejudicial. *See Bouder v. Prudential Fin., Inc*., No. 06- 4359, 2010 WL 2026707 (D.N.J. May 21, 2010) ("The tardy disclosure [of an expert report] during summary judgment briefing is prejudicial."); *Frolow v. Wilson Sporting Goods, Co.*, No. 05- 4813, 2008 WL 918495 (D.N.J. Mar. 31, 2008) (excluding expert report submitted in opposition to summary judgment motion that violated the court's Scheduling Order); *see also Moore v. Vangelo*, No. 03-4718, 2005 WL 2178885, at *8 (E.D. Pa. Sept. 6, 2005) (excluding expert report served during summary judgment where the expert report was provided two months after the deadline set forth in the court's scheduling order.).

Southco prepared for summary judgment and the then-imminent trial based on Dr. Pratt's opening report and without any access to Fivetech's testing or rebuttal expert opinions. Fivetech, by contrast, had an improper advantage during summary judgment as they had unrestricted access to Southco's expert opinions (as required by FED. R. CIV. P. 26) while simultaneously concealing Fivetech's expert opinions from Southco until they were submitted to the court. Properly

considered, the first *Pennypack* factor supports exclusion of the Dornfeld Declaration.

2.    **The district court erred in concluding that Southco's Opposition cured the prejudice caused by the Dornfeld Declaration**

The district court incorrectly determined that Southco's opposition during summary judgment cured the prejudice to Southco resulting from the untimely Dornfeld Declaration. (A47.) Southco's opposition was necessarily limited to the four corners of the Dornfeld Declaration. That is, without discovery (such as a deposition of Dr. Dornfeld regarding his untimely report), Southco's opposition could not address any of the reliability issues, inconsistencies with other evidence, or otherwise cross-examine Dr. Dornfeld regarding his testing, analysis, or opinions as set forth above in Section IV(A). Southco's limited ability to address the new opinions in the Dornfeld Declaration that were based on undisclosed testing did not cure the prejudice resulting from Fivetech's untimely disclosure. Thus, properly considered, the second *Pennypack* factor supports exclusion of the Dornfeld Declaration.

3.    **Admitting the Dornfeld Declaration would disrupt and delay the trial**

Allowing the Dornfeld Declaration would have disrupted trial. The disclosure of expert reports was due "[n]o later than March 6, 2012." Moreover, expert discovery closed in this case on April 9, 2012. Allowing the Dornfeld

Declaration should have required issuing a new scheduling order and yet another round of discovery. Such an approach was favored by the *Pennypack* court. Specifically, with respect to newly admitted evidence, the *Pennypack* court provided as a safeguard the remedy of delaying trial while additional discovery was taken. *Pennypack*, 559 F.2d at 905. Southco would have taken additional discovery from Fivetech regarding the Dornfeld Declaration including, but not limited to, deposition and document discovery. This additional required discovery would have necessarily delayed the trial.

Thus properly considered, the third *Pennypack* factor supports exclusion of the Dornfeld Declaration.

4. **Fivetech's disregard of the Scheduling Order and unsatisfactory explanation for doing so demonstrates its bad faith and willfulness**

Fivetech made a conscious decision not to serve any expert reports as required by the Scheduling Order. (A4082 ("the only basis for Southco's motion to strike … must be on Fivetech's decision not to serve a rebuttal report in response to the infringement report of John D. Pratt, Ph.D.); A4083 ("[i]n an effort to conserve time and costs … Fivetech elected not to prepare a rebuttal report from Dr. Dornfeld, since it was obvious that Southco would not be able to meet its burden.") Fivetech's claim that "Southco would not be able to meet its burden" was, however, belied by Fivetech's subsequent and untimely submission of the

Dornfeld Declaration during summary judgment.  The Dornfeld Declaration is an implicit admission by Fivetech that Southco had, in fact, carried its burden. Fivetech provided no justification for this about-face.

Bad faith may be shown through violation of scheduling orders coupled with unsatisfactory explanations.  *See Exxon Corp. v. Halcon Shipping*, 156 F.R.D. 589, 591 (D.N.J.1994) (violations of scheduling orders coupled with unsatisfactory explanations may be characterized fairly as bad faith).  Fivetech's inability to provide a legitimate explanation for its delay is evidence of bad faith and willfulness.

The district court acknowledged Fivetech's decision not to prepare a rebuttal report, and further noted that filing a rebuttal report "[w]ould have been more strictly in compliance with the Federal Rules of Civil Procedure and this Court's Scheduling Order …."  (A47.)  The district court, however, did not address Fivetech's reason for disregarding the Scheduling Order by filing the Dornfeld Declaration.  Thus, properly considered, the fourth *Pennypack* factor supports exclusion of the Dornfeld Declaration.

### 5.    **Fivetech failed to establish the Dornfeld Declaration's importance**

Fivetech did not argue that the Dornfeld Declaration was critical to Fivetech's claims or defenses.  In fact, Fivetech's only explicit reason for providing the Dornfeld Declaration is "to assist this Court."  (A4076.)  *See*

*Patterson v. Balsamico*, 440 F.3d 104, 118 (2d Cir. 2006) ("Under the circumstances, with no explanation to the district court of the importance of the testimony of these witnesses, this factor would not indicate that the district court abused its discretion in excluding the witnesses."). Moreover, any statement by Fivetech that the Dornfeld Declaration is important evidence is directly contradicted by Fivetech's express reason for not providing a rebuttal expert report within the timeframe set forth by the Scheduling Order – they did not need one. (A4083 ("[i]n an effort to conserve time and costs … Fivetech elected not to prepare a rebuttal report from Dr. Dornfeld, since it was obvious that Southco would not be able to meet its burden."))

Thus, properly considered, the fifth *Pennypack* factor supports exclusion of the Dornfeld Declaration.

Regardless, even if the declaration were critical to Fivetech's case, that fact alone would not excuse the district court's abuse of discretion, because the mere importance of the evidence alone is insufficient to avoid exclusion. *See Konstantopoulos*, 112 F.3d at 719 (holding that critical evidence may be excluded when party flagrantly or willfully disregards a scheduling order). Fivetech's admitted decision to provide the Dornfeld Declaration after the close of discovery, instead of within the timeframe set forth by the Scheduling demonstrates a flagrant, and willful, disregard of the Scheduling Order.

On balance, all five *Pennypack* factors support exclusion of the Dornfeld Declaration. The district court's decision to allow the declaration and rely upon it in granting Fivetech's motion for summary judgment of noninfringement without consideration of the *Pennypack* factors thus constitutes an abuse of discretion that requires reversal of the district court's grant of summary judgment of noninfringement of the '012 Patent.

## VI. THE DISTRICT COURT ERRED BY GRANTING SUMMARY JUDGMENT OF NONINFRINGEMENT OF THE ASSERTED TRADEMARKS

### A. The district court erred in concluding that Fivetech did not use the Segmented Circle Mark "in commerce"

The district court's determination that Fivetech did not use the accused Segmented Circle Mark "in commerce" resulted from two errors of law. First, the district court relied on an erroneous definition of "use in commerce." Second, the district court improperly resolved in Fivetech's favor genuine disputes of material fact regarding Southco's evidence of Fivetech's "use in commerce." Both of these errors warrant a reversal of the district court's grant of summary judgment.

#### 1. The district court's decision is based on the wrong definition of "use in commerce."

The district court relied upon the wrong definition of "use in commerce" when it concluded that Southco had failed to demonstrate Fivetech's use of the Segmented Circle Mark "in commerce" as required by § 1114. Specifically, the

district court applied the limited "use in commerce" definition for *registering* trademarks, a definition inconsistent with the "broad jurisdictional powers" conferred upon the courts to adjudicate trademark infringement. *Bulova*, 344 U.S. at 283 ("The Lanham Act … confers broad jurisdictional powers upon the courts of the United States").

The Third Circuit has not addressed whether "use in commerce" has the same meaning in Sections 1114 and 1127 of the Lanham Act. The Second Circuit, whose precedent is extensively relied upon by the district court in deciding Southco's Lanham Act claims, correctly addressed this question. *See Rescuecom Corp. v. Google, Inc.* 562 F.3d 123, 131-41 (2d. Cir. 2009). The *Rescuecom* court conducted an in depth review of the statutory framework and legislative history surrounding "use in commerce" and concluded that the Lanham Act "employs the term 'use in commerce' in two very different contexts"—registration (§ 1127) and enforcement (§ 1114). *See id*. The Second Circuit further noted that liability for trademark infringement cannot require an accused infringer to have made "*bona fide* use of the mark in the ordinary course of trade, and not merely to reserve a right in a mark" as defined by 15 U.S.C. § 1127 (emphasis added). *See id*. Applying the § 1127 definition to 15 U.S.C. § 1114 forces the absurd result that

> an accused infringer would *escape* liability, notwithstanding deliberate deception, precisely because he acted in *bad faith*. A bad faith infringer would not have made a use in commerce, and therefore a necessary

element of liability would be lacking. Liability would fall
only on those defendants who acted *in good faith*.

*Id*. at 133 (emphasis in original).  Accordingly, the Second Circuit concluded, "use

in commerce" as defined by § 1127 "cannot apply to the infringement sections" of

the Lanham Act.

The district court cites two cases in support of its incorrect conclusion that

"advertising alone is not enough to constitute 'use in commerce' because the

statute requires that the good itself be sold or transported in commerce."  (A56

(citing *Buti v. Perosa, S.R.L.*, 139 F.3d 98 (2d Cir. 1998) *and Int'l Bancorp, LLC v.*

*Societe des Bains de Mer et du Cercles des Etrangers a Monaco*, 329 F.3d 359 (4th

Cir. 2003).  Both cases, however, considered the "use in commerce" requirement

for obtaining rights in a trademark.  *See Buti*, 139 F.3d at 103-04 (Plaintiff's

advertising activities alone did not demonstrate "use in commerce" and establish

rights in the mark);  *Int'l Bancorp*,  329 F.3d at 364-65 (same).  Neither case

considered the "use in commerce" necessary to subject an accused defendant to

liability for trademark infringement.  Thus, neither case is relevant to the case at

bar.

2. **Fivetech's uses of the Segmented Circle Mark are each a "use in commerce" within the meaning of 15 U.S.C. § 1114.**

Fivetech's website catalogue, its offer to SRI, and its Segmented Circle Application are each a "use in commerce" sufficient to establish jurisdiction under the Lanham Act.

It is well-settled that using a web site to promote goods or services, without more, satisfies the "use in commerce" requirement for trademark infringement. *Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1054 (10th Cir. 2008) (noting that "in commerce" requirement is "merely jurisdictional," and concluding that, because "the Internet is generally an instrumentality of interstate commerce, ... the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet"); *Laurel Capital Group v. BT Financial Corp*., 45 F. Supp. 2d 469 (W.D. Pa. 1999) (maintenance of web site featuring and promoting services in connection with the allegedly infringing mark constitutes use in commerce); *see also AvePoint, Inc. v. Power Tools, Inc*., No. 13-0035, 2013 WL 5963034 (W.D. Va. Nov. 7, 2013) (Because the internet is an "instrumentality of interstate commerce," courts have repeatedly held that the unauthorized use of a trademark on the internet satisfies the "in commerce" requirement).

Using the incorrect registrability definition of "use in commerce," the district court erred in concluding that "neither Fivetech's website, product

catalogue, nor price quotes to SRI can constitute a 'use in commerce' of the [Segmented Circle] Mark." (A56.)   At a minimum, Fivetech's online catalogue, which depicts the 46 Series Catalogue Screws bearing the Segmented Circle Mark is a "use in commerce" sufficient to invoke the "broad jurisdictional powers" of the Lanham Act. *Bulova*, 344 U.S. at 293.

The district court incorrectly made a factual finding against Southco when it discounted Southco's evidence that Fivetech offered to sell infringing captive screws to SRI because "[n]one of these involved the [Segmented Circle] mark being sold or transported in United States commerce." (A56.)   Liability for trademark infringement under § 1114 extends to the unauthorized use of a trademark "in connection with the sale, **offering for sale**, distribution, or advertising of goods or services." 15 U.S.C. § 1114 (emphasis added).   It is axiomatic that "[a]n offering to sell without more will suffice to establish liability." *Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 WL 423446 (E.D. Pa. Feb. 14, 2008); *see also Tommy Bahama Grp., Inc. v. Sexton*, No. 07-06360 EDL, 2009 WL 4673863 (N.D. Cal. Dec. 3, 2009) aff'd, 476 F. App'x 122 (9th Cir. 2012) ("The [Lanham Act] statute does not require evidence of an actual sale to establish infringement; an offer to sell is sufficient.").   Thus, the district court's application of the limited registrability definition of "use in commerce"  for infringement

purposes is unworkable for a second, separate reason: it excludes a statutorily defined act of infringement—an offer for sale.

"'Use in commerce' is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). The undisputed evidence proffered by Southco, including the Fivetech online catalogue, the Segmented Circle Application, and the offer to SRI, meets this jurisdictional predicate. In view of the foregoing, the district court's judgment of no trademark infringement relies on a fundamentally flawed definition of "use in commerce" that is inconsistent with the "broad jurisdictional powers" of the Lanham Act and warrants reversal. *Bulova*, 344 U.S. at 293.

> ### 3. The district court improperly resolved a genuine dispute of material fact in the face of the sworn declaration of Fivetech's trademark attorney, Mr. Rabin, that actual use had occurred

The district court also committed reversible error when it concluded that "no reasonable jury could find that Fivetech's [Segmented Circle] mark was used in United States commerce solely on the basis of the [Segmented Circle Application]." (A57.) In doing so, the district court made a factual and credibility determination—that the declaration of Fivetech's president Gary Wang was to be believed over the sworn declaration of Mr. Rabin that the Segmented Circle Mark

had been used in United States commerce.  (A57-58.)  In a jury trial, credibility determinations such as these are the province of the jury.  *See Scully v. US WATS, Inc.*, 238 F.3d 497, 506 (3d Cir. 2001) ("Credibility determinations are the unique province of a fact finder, be it a jury, or a judge sitting without a jury").

The sworn declaration of Mr. Rabin - Fivetech's own attorney - that the Segmented Circle Mark was used in United States commerce directly contradicts the declaration of Fivetech's president Gary Wang.  Because Mr. Rabin's declaration calls Mr. Wang's credibility into question, Fivetech's motion for summary judgment should have been denied.  *See Losch v. Borough of Parkesburg, Pennsylvania,* 736 F.2d 903 (3d Cir. 1984) (conflicts of credibility should not be resolved on a motion for summary judgment); *see also Cram v. Sun Insurance Office, Ltd.*, 375 F.2d 670 (4th Cir. 1967) ("clearly the credibility of a witness is a factual issue which precludes summary judgment.").  Given the low jurisdictional threshold of the "use in commerce" requirement for § 1114 as set forth above, a reasonable jury very well could have concluded that the declaration by Mr. Rabin was competent evidence of "use in commerce."  A reasonable jury could find that the declaration of Fivetech's President, which was prepared during and for the purposes of this litigation, to be less credible than the Rabin declaration in the Segmented Circle Application, which was prepared on behalf of Fivetech at the time of filing its trademark application and without knowledge of or influence

from, this litigation. The district court's resolution of this genuine dispute of material fact in Fivetech's favor is reversible error. *Anderson*, 477 U.S. at 255.

## CONCLUSION

For all of the above reasons, Southco respectfully requests that this Court reverse the district court's construction of "attached" in the '095 and '131 Patents, and reverse the district court's construction of "rigidly secure" and "fills said chamfer" in the '012 Patent. Southco also respectfully requests that this Court reverse the orders granting summary judgment of noninfringement of claims 1-15 of the '095 Patent, claims 1-15 of the '131 Patent, and claims 1-14 of the '012 Patent. Further, Southco respectfully requests that this Court reverse the order granting summary judgment of noninfringement of the '685 Registration and the '153 Registration. Finally, Southco respectfully requests that this Court reverse the district court's denial of Southco's motion to strike the Dornfeld Declaration.

Date: June 2, 2014                  Respectfully submitted,

*/s/ Benjamin E. Leace*
Benjamin E. Leace
Brian S. Seal
Andrew J. Koopman
Christopher H. Blaszkowski
RATNER PRESTIA
1235 WESTLAKES DRIVE
SUITE 301
BERWYN, PA 19312
610−407−0700

*Attorneys for Plaintiff-Appellant*
*Southco, Inc.*

# ADDENDUM TABLE OF CONTENTS

1.  D.I. 266, Order, docketed 1/24/2014 ………………………………….. A1-3

2.  D.I. 267, Amended Order, docketed 1/28/2014 …………………………. A4

3.  D.I. 186, Order, docketed 1/25/2012 ………………………….............. A5

4.  D.I. 185, Memorandum, docketed 1/25/2012 ……………................... A6-21

5.  D.I. 251, Order, docketed 9/20/2013 ………………………….............. A22

6.  D.I. 250, Memorandum, docketed 9/20/2013 …………….................. A23-44

7.  D.I. 253, Order, docketed 11/12/2013 ………………………………….. A45

8.  D.I. 256, Order, docketed 11/12/2013 ……………………………… A46-48

9.  D.I. 252, Memorandum, docketed 11/12/2013 …………………….... A49-67

10.  D.I. 255, Order, docketed 11/13/13 ………………………….............. A68

11.  D.I. 254, Memorandum, docketed 11/13/13 ………………………... A69-73

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOUTHCO, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FIVETECH TECHNOLOGY INC. | : | NO. 10-1060 |

<u>ORDER</u>

AND NOW, this 24th day of January, 2014, IT IS HEREBY ORDERED that FINAL JUDGMENT is ENTERED in favor of Fivetech pursuant Federal Rule of Civil Procedure 54(b) as to the Court's orders dated January 24, 2012 (Docket No. 186), September 19, 2013 (Docket No. 251), and November 12, 2013 (Docket No. 253). The Court determines that there is no just reason for delay of the appeal of these orders.

On January 24, 2012, the Court granted Fivetech's motion for partial summary judgment of noninfringement on the '095 patent and '131 patent claims. On September 19, 2013, the Court granted Fivetech's motion for partial summary judgment of noninfringement on the '012 patent claims. On November 12, 2013, the Court granted Fivetech's motion for partial summary judgment of noninfringement on the '685 trademark and the '153 trademark claims.

A1

Rule 54(b) provides that, when an action involves more than one claim for relief, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Courts analyzing whether Rule 54(b) applies must focus on the finality of the judgment and the separateness of the claims for relief. W.L. Gore & Assocs. v. Int'l Med. Prosthetics Research Assocs., Inc., 975 F.2d 858, 862 (Fed. Cir. 1992).

In order for Rule 54(b) to apply, the judgment must be final with respect to one or more claims. A judgment is not final for Rule 54(b) purposes unless it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." Id. at 861-62 (emphasis omitted). Additionally, a court "must take into account judicial administrative interests . . . the equities involved . . . [and] the historic federal policy against piecemeal appeals." Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 8 (1980).

The circumstances of this case support this Court's decision to certify these judgments as final under Rule 54(b). This judgment disposes of Southco's claims against Fivetech for patent infringement and trademark infringement in their entirety. Furthermore, Southco's claims against Fivetech for

patent infringement and trademark infringement are separable from the other claims in this case involving patent invalidity and state law torts. The remaining counterclaims in this case have been dismissed without prejudice pursuant to an order bearing today's date. Therefore, the Court concludes that the foregoing reasons support the Rule 54(b) certification.


                              BY THE COURT:

                              /s/ Mary A. McLaughlin
                              MARY A. McLAUGHLIN, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                    :        CIVIL ACTION
                                 :
            v.                   :
                                 :
FIVETECH TECHNOLOGY INC.         :        NO. 10-1060

<u>AMENDED ORDER</u>

AND NOW, this 28th day of January, 2014, whereas the Court issued an order on January 24, 2014 (Docket No. 266), entering final judgment pursuant to Rule 54(b) in favor of Fivetech on three of this Court's prior orders; and whereas the Court omitted from that final judgment one of its prior orders, dated March 23, 2012 (Docket No. 195), granting Fivetech's motion for partial summary judgment of noninfringement on claims 16 and 17 of the '095 patent, the Court hereby amends its order dated January 24, 2014 to also enter final judgment in favor of Fivetech pursuant to Federal Rule of Civil Procedure 54(b) as to the Court's order dated March 23, 2012 (Docket No. 195).

BY THE COURT:


<u>/s/ Mary A. McLaughlin</u>
MARY A. McLAUGHLIN, J.

A4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOUTHCO, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FIVETECH TECHNOLOGY INC. | : | NO. 10-1060 |

ORDER

AND NOW, this 24th day of January, 2012, upon consideration of the defendant's Motion for Partial Summary Judgment of Noninfringement of Claims 1-15 of U.S. Patent No. 5,851,095 and Claims 1-15 of U.S. Patent No. 6,280,131 (Docket No. 92), the response and reply thereto, and following oral argument held on October 20, 2011, IT IS HEREBY ORDERED, for the reasons stated in a memorandum of law bearing today's date, that the defendant's motion is GRANTED. Judgment is hereby ENTERED in favor of the above-named defendant and against the plaintiff on these claims.

BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

A5

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                    :        CIVIL ACTION
                                 :
           v.                    :
                                 :
FIVETECH TECHNOLOGY INC.         :        NO. 10-1060

MEMORANDUM

McLaughlin, J.                              January 24, 2012

          The plaintiff in this case is a manufacturer of

hardware, including "panel" or "captive" screws. The defendant

is a competitor of Southco. Southco alleged patent infringement

by Fivetech on three of its patents. Fivetech moved for partial

summary judgment on all of the claims in one patent and fifteen

claims in another. The Court will grant Fivetech's motion.

I.    Procedural History

          Southco alleges that Fivetech infringed on its patents

and trademarks through the sale of Fivetech Series 46 captive

fasteners ("series 46 screws"). Specifically, Southco alleges

infringement on its patent number 5,851,095 ("the '095 patent")

issued on December 22, 1998; on its patent number 6,280,131 ("the

'131 patent") issued on August 28, 2001; on its patent number 6,468,012

("the '012 patent") issued on October 22, 2002; and on its trademark

registrations numbers 2,478,685 and 3,678,153. Compl. ¶¶ 11-15 ('095

patent), 20-23 ('131 patent), 28-31 ('012

patent), 36-44 (trademark).

The current motion for partial summary judgment concerns only on the '095 patent and the '131 patent. Fivetech argues that its series 46 screws do not violate the first fifteen claims of Southco's '095 patent or any of the fifteen claims of Southco's '131 patent. The Court held an oral argument on this motion on October 20, 2011.

II.   <u>Summary Judgment Record</u>

A captive screw, or captive fastener, is a device which holds a screw in place while the screw is used to connect two panels. A cylindrical ferrule holds the screw[1] and a knob can be placed over the screw head. Pl. Resp. 2; Def. Br. 2-4. The question in this suit is the scope of the claims language of Southco's captive screw patents. The parties do not dispute the construction of the accused Fivetech device.

The language of Claims 1, 4, 7, 10, and 13 of the Southco '095 patent, with emphasis added to the disputed portions, is:

> a hollow ferrule having a first end and a second end
> through which the threaded shaft slides, the ferrule
> having a panel attachment means at the first end to
> secure the captive screw to the panel, and <u>a threaded
> shaft captivation means</u>, said threaded shaft
> captivation means adjacent the second end, <u>wherein the
> second end of the ferrule is slidably and rotatably
> attached to the knob</u> such that when the threaded shaft
> is in a retracted position, <u>the threaded shaft
> captivation means prevents the ferrule and the knob</u>

---

[1] Screws are also called "threaded shafts."

from separating and when the threaded shaft is in an
extended position, the flat, annular bottom surface of
the head portion of the screw is in contact with the
second end of the ferrule.

Def. Br., Ex. A.

The relevant language in the Southco '131 patent is

slightly different. Claim 1 says:

. . . . a screw captivation means adjacent said second
end of said ferrule, said second end of said ferrule
being slidably and rotatably engaged with said knob
wherein said screw captivation means prevents said
ferrule and said knob from disengaging when said
threaded shaft is in a retracted position and said head
of said screw is in contact with said second end of
said ferrule when said is in an extended position.

Def. Br., Ex. B.

Claims 9 and 14 of the '131 patent use this language:

a hollow ferrule having a first end and a second end
through which the screw slides, the ferrule having a
panel attachment means at the first end to secure the
captive screw to the panel and a screw captivation
means, said screw captivation means adjacent the second
end, where in the second end of the ferrule is slidably
and rotatably attached to the knob.

Id.[2]

Claim 12 of the '131 patent provides only a description of the

function, and not the structure, of the device. The relevant

part of the claim reads:

d) a hollow ferrule having a first end and a second end
through which the threaded shaft slides, the ferrule
having a panel attachment means at the first end to
secure the captive screw to the panel and a threaded
shaft captivation means, said threaded shaft
captivation means adjacent the second end.

Id.

---

[2] Claim 14 uses "threaded shaft" in place of "screw."

In the Fivetech device, the screw is captured using a
washer which connects to the ferrule. The screw head is attached
to the knob. The knob and ferrule are not attached to one
another, although they are prevented from separating by the
joinder of the screw to the knob. See Pl. Resp. 14-15; Def. Br.,
Ex. G.

III. <u>Analysis</u>[3]

In a patent infringement case, the court proceeds in
two steps. <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370,
384-85 (1996). In the first step, the court must construe the
claims in the patent. Because a patent is a legal instrument,
this is a question of law.[4] The second step requires determining

---

[3] A party is entitled to summary judgment if there "is no
genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
The moving party bears the initial burden of demonstrating the
absence of any genuine issue of material fact, which may be
satisfied by demonstrating the party who bears the burden of
proof lacks evidence to support his case. <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 323 (1986). In making its determination,
the court must consider the evidence in a light most favorable to
the nonmoving party. <u>Del. Valley Floral Grp., Inc. v. Shaw Rose
Nets, LLC</u>, 597 F.3d 1374, 1378-79 (Fed. Cir. 2010). Once a
properly supported motion for summary judgment is made, the
burden of production then shifts to the nonmoving party, who must
set forth specific facts showing that there is a genuine issue
for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250
(1986).

[4] The Court held argument on this motion on October 20,
2011. Although no evidence was presented, Fivetech told the
Court that it considered the argument a sufficient <u>Markman</u>
hearing. Southco did not object. Tr. 10/20/11 at 96.

if the claims are infringed. Infringement is a question of fact to be decided by a jury. Id.

    A.   Construing a Patent Claim

       In the first step of an infringement suit, the court must determine the scope and meaning of the asserted claims. Id. at 372-74; Searfoss v. Pioneer Consol. Corp., 374 F.3d 1142, 1148 (Fed. Cir. 2004). The focus of this inquiry is the specific language used in the claim section of the patent. Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP, 616 F.3d 1249, 1254 (Fed. Cir. 2010). The language of a claim is given the "ordinary and customary meaning" as understood by a person of ordinary skill in the art in question, unless the patentee defined a term differently. Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); Searfoss, 374 F.3d at 1149. A person of ordinary skill is deemed to read the claim term "in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313 (quoting Multiform Desiccants, Inc. v Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

       Claims should be interpreted to give effect to all terms. A claim assertion should not be adopted which makes characteristics of the claim superfluous. Becton, 616 F.3d at 1257. Claims should be read in the context of surrounding words and as part of a "fully integrated written instrument." Phillips, 415 F.3d at 1314-15. Claims "must be read in view of

the specification . . . [which are] always highly relevant to the

claim construction analysis." Id. at 1315. The Federal Circuit

has cautioned, however, that courts should not "import into a

claim limitations that are not part of the claim" which appear

only in the patent's written description. Superguide Corp. v.

DirecTV Enters., 358 F.3d 870, 875 (Fed. Cir. 2004).

      Extrinsic evidence, such as dictionaries, treaties,

expert testimony, and inventor testimony, can also be considered

in construing a claim, but is less significant than the patent

itself. Phillips, 415 F.3d at 1317. Extrinsic evidence cannot

be relied upon to "vary or contradict the clear meaning of terms

in the claims." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363,

1369 (Fed. Cir. 2003).

    B.   Construing These Claims

The primarily disputed term in the '095 patent and '131

patent claims is the word "attached." The full phrase in most of

the claim language is "the ferrule is slidably and rotatably

attached to the knob."[5] The patents do not define the term and

---

[5] The parties agree that because these descriptions provide
the structure that performs the recited function, the Court does
not need to analyze these claims under the 35 U.S.C. § 112 ¶ 6
"means-plus-function" formula. The parties agree that claim 12
is analyzed slightly differently than the other claims, as a
"means-plus-function" claim under 35 U.S.C. § 112 ¶ 6. Under
this provision, a court must identify structure corresponding to
the function described. Lockheed Martin Corp. v. Space
Systems/Loral Inc., 324 F.3d 1308, 1319 (Fed. Cir. 2003). The
structure associated with the function, "a threaded shaft

neither party suggests that those of ordinary skill in the art in question understand the term any differently than its common meaning. The clear import of the patents' claims is that the ferrule and knob are directly connected to one another. This is the means by which the screw in the Southco patents is held in place.

Southco argues that as used in its claims, "attached" does not necessarily require direct contact between the ferrule and the knob. Instead, Southco argues that "attached" covers devices, such as the Fivetech screw, in which the ferrule is ultimately prevented from separating from the screw and knob; in other words, the claim covers devices where the ferrule and knob are indirectly attached.

Southco cites several cases in support of its interpretation of the word "attached." In <u>Am. Seating Co. v. USSC Group, Inc.</u>, 91 F. App'x 669, 672 (Fed. Cir. 2004), in a non-precedential opinion, the Federal Circuit held that "attached to said vehicle" included attachments to "any structure that is . . . permanently part or permanently affixed to the vehicle." In <u>Ex Parte Johann</u>, the Board of Patent Appeals held that "attached to" does not require direct attachment of the two objects described to one another. Instead, "attached to" includes

---

captivation means" described in claim 12 is the same structure described in the other claims at issue here and therefore the Court will construe them in the same way.

fastening, securing or joining, either directly or indirectly, those objects. See Baronian Decl., Ex. F, Ex Parte Johann, Appeal No. 2008-5689, at 10 (Bd. Patent App. Apr. 30, 2009). In Ex Parte Bhattacharya, the Board held that for the purpose of granting a patent, a claim which did not use the phrase "directly attached" would not be presumed to have intended that the two objects were directly attached. Id., Ex. G, Ex Parte Bhattacharya, Appeal No. 2008-2294, at 4 (Bd. Patent App. July 14, 2008). In Royal Typewriter, Judge Learned Hand wrote that "we speak of two objects as 'attached' to each other, though they are connected by a train of links or event by a chain." Royal Typewriter Co. v. Remington Rand, Inc., 168 F.2d 691, 693 (2d Cir. 1948).

In other cases, courts construe "attached" to mean directly connected. In Jurgens v. McKasy, the Federal Circuit held that the word "attached" in the claims limitation at issue required a "direct series connection" between the two described parts. 927 F.2d 1552, 1560-61 (Fed. Cir. 1991). The court noted that neither the claims, embodiment, or patent prosecution history suggested an alternate reading. Id. In Searfoss, the Federal Circuit held that as used in a claim, "connecting" requires a "direct connection[]" between the two objects because "connecting" is synonymous with "attaching." Searfoss, 374 F.3d at 1150. See also Affymetrix Inc. v. Hyseq, Inc., 132 F. Supp. 2d

1212, 1221 (N.D. Cal. 2001) (rejecting argument that "covalently attached" means "indirectly" attached because that reading was contrary to the plain language of the claim and not supported by intrinsic evidence).

Notably, the courts in all of these cases considered the word "attached" in the context of the specific patents, reading the word in the context of the patent claims and other intrinsic evidence.

The language of the Southco patent claims, that "the ferrule is slidably and rotatably attached to the knob," describes a captivation mechanism in which a screw is held in place by the connection between a knob and ferrule. It is clear from the plain language of the claim that the ferrule is attached by direct interaction with the knob. This reading gains strength when the patents' preferred embodiment language, diagrams included in the patent, and prosecution history are considered. Both the preferred embodiment and diagrams in the patents unambiguously describe a capture mechanism in which the knob and ferrule directly connect by opposing flanges, or edges, which prevent the two parts from separating.[6] Neither the prosecution

---

[6] The relevant language from the Preferred Embodiments in 6 both patents, referring to the numbering in the patent diagram says, specifically describes the connection between the knob and ferrule: "the knob 30 is attached to the ferrule 50 . . . . The limited axial movement is accomplished by a first annular flange 35 on the knob 50 extending inwards from the inner surface 38 of the hollow knob 30 towards the threaded shaft 22, in combination

history nor any other intrinsic evidence supports Southco's interpretation that the patents include an "indirect" attachment between knob and ferrule.[7]

Southco's reading would cover any captive screw in which a knob and ferrule are linked by any means, including one or more additional parts of a capture device. This reads out of the patent the way in which the Southco claimed invention actually captures the screw: using a direct connection between the knob and ferrule. Such a reading makes superfluous the description of the knob and flanges in the Southco patents and the Court declines to construe the claims against their clear language and the preferred embodiment described in the patent.

---

with a second annular flange 56, integral to the ferrule 50, extending outward from the body of the ferrule 50 at the knob end or first end of the ferrule 50. . . . <u>The first and second annular flanges 35 and 56 allow the knob 30 and the ferrule 55 to be a single, non-detachable assembly</u> . . . ." '095 patent, Columns 4:62-5:15; '131 patent, Column 5:3-23 (emphasis omitted and added).

[7] Because the intrinsic evidence is sufficient to construe the claim, the Court does not need to consider extrinsic evidence. Southco provides an affidavit by Dr. Pratt, a professional engineer with a PhD in civil engineering. Pl. Resp., Ex. 1, Pratt Decl. ¶ 2. Pratt concludes that the knob of the Fivetech screw is attached to the ferrule "because the knob cannot be pulled apart from the ferrule." <u>Id.</u> ¶ 11. He examines a dictionary definition of "attached" and concludes that "'attached' as used in the claim must mean simply that the knob and ferrule are held together such that they cannot be separated." <u>Id.</u> ¶ 12-13. Even if that testimony were considered, however, Dr. Pratt does not provide evidence that those skilled in the relevant art would understand "attached" any differently than its ordinary meaning.

The Southco patent claims at issue are construed to cover a captive screw in which a threaded screw is captured by a connection between a knob and a ferrule.

    C.    <u>Infringement</u>

       After the claim is properly construed, the next question is a factual one: does the accused device infringe on the properly construed patent claims?[8] There are two types of infringement: literal infringement and infringement under the doctrine of equivalents. Fivetech argues that there is no genuine issue of material fact on the question of infringement.

       1.   <u>Literal Infringement</u>

       Literal infringement requires that every limitation of the patent claim be found exactly the same in the accused product. There is no literal infringement if any claim limitation in the patent is missing from the accused device. <u>Becton</u>, 616 F.3d at 1253. "There can be no literal infringement where a claim requires two separate structures and one such structure is missing from an accused device." <u>Id.</u> at 1255-56.

       The Southco patents require that a screw is held in place because of an attachment between the knob and ferrule. In the Fivetech series 46 fastener, the screw is held into place by

---

    [8] Claim 12 of the '131 patent, because it is analyzed under a means-plus-function rubric, is addressed slightly differently in the infringement analysis.

a ferrule attached to a washer; the knob in the accused Fivetech device plays no role in capturing the screw. Therefore the series 46 screw does not meet every limitation of the Southco claims. The Court concludes that no reasonable jury could find that every limitation of the patent claim exists in the Fivetech screw.

Southco's argument to the contrary relies not on an examination of the Fivetech device, but on Fivetech's 2008 patent application for the series 46 screw. In the abstract of the application, Fivetech describes the series 46 screw as containing "a knob, mounted on to the force exerted portion of the locking unit [a spring] and movably coupled with the ferrule." Pl. Resp., Pratt Decl., Ex. I (emphasis added). The description, in so far as "coupled" is even synonymous with "attached," does not address the way in which the knob and ferrule are ultimately joined in the device. Indeed, in the Fivetech patent, other descriptions of the series 46 screw show that the knob and ferrule are not connected to one another. This description in the Fivetech patent is not sufficient to create a genuine issue of material fact on whether the Fivetech device reaches all of the claims of the Southco patents.

2.    Infringement Under the Doctrine of Equivalents

If there is no literal infringement, there still may be infringement under the doctrine of equivalents. This is an

equitable doctrine designed to prevent fraud on a patent. When "the accused device contains an 'insubstantial' change from the claimed invention" or "the element of the accused device performs substantially the same function in substantially the same way to obtain the same result" the accused device is equivalent to the claimed one and infringes upon it. TIP Systems, LLC v. Phillps & Brooks/Gladwin, Inc., 529 F.3d 1364, 1376 (Fed. Cir. 2008). The central question under the doctrine of equivalents "is whether the accused device operates in the 'same way' as the claimed invention." Searfoss v. Pioneer Consol. Corp., 374 F.3d 1142, 1150-51 (Fed. Cir. 2004).

The doctrine is important for protecting the claims of patent owners. It also, however, can expand a patent beyond the plain language of the claim. Therefore, "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997). Under this "all elements" or "all limitations" rule, the doctrine of equivalents is limited: "[T]here can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device." Lockheed Martin Corp. v. Space Systems/Loral, Inc., 324 F.3d 1308, 1321 (Fed. Cir. 2003). The all elements rule is a legal limitation

which is determined by the court. <u>Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 567 F.3d 1314, 1323 (Fed. Cir. 2009).

   In determining equivalency, one factor to consider is the known interchangeability of the means used in the patent with the means used in the accused device. <u>Warner-Jenkinson Co.</u>, 520 U.S. at 37. Known interchangeability, however, is not dispositive of equivalence. <u>Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.</u>, 145 F.3d 1303, 1309 (1998). Rather, the question is whether the patentee is provided a fair scope of protection for his patent. <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 535 U.S. 722 (2003).

   The existing technology is also relevant as a limitation on the doctrine of equivalents. "[I]t is well settled law that a patentee cannot assert a range of equivalents that encompasses the prior art." <u>Interactive Pictures Corp. v. Infinite Pictures, Inc.</u>, 274 F.3d 1371, 1380 (Fed. Cir. 2001). This is because "a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained" by a literal claim. <u>Wilson Sporting Goods v. David Geoffrey & Assoc.</u>, 904 F.2d 677, 684 (Fed. Cir. 1990).

   The Court finds that the "all elements" test is not met in this case. The Southco patents require that the ferrule and the knob be attached in order for the screw to be held in place. If the knob were broken on the Southco device described in the

patents, the screw would not be held in the ferrule. By contrast, if the knob was broken from the series 46 screws, the screw would still be held in place in the ferrule. If the Court were to adopt Southco's interpretation of the patents to cover the Fivetech screws, the parts of the claim which even describe the knob would be written out of the claim entirely. The Fivetech device uses a washer, which is entirely absent from the Southco patents. This additional piece of equipment is not an insubstantial change to the Southco patents. The Fivetech series 46 screw does not perform the capture of the screw in substantially the same way as described in the Southco parents. Therefore, there is no infringement under the doctrine of equivalents.

> 3.   Infringement of Claim 12 of the '131 Patent

Claim 12 of the '131 patent is analyzed under the "means-plus-function" formula in 35 U.S.C. § 112 ¶ 6. Literal infringement under § 112 ¶ 6 "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification." Lockheed, 324 F.3d at 1320. This test is closely related to the doctrine of equivalents analysis, because both look to the similarity of function of the structures at issue. Chiuminatta, 145 F.3d at 1310.

For the reasons described above, claim 12 is not infringed because the function described in claim 12 of the '131 patent keeps the screw captured in a different way than in the series 46 screws.

An appropriate order shall issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                  :           CIVIL ACTION
                               :
            v.                 :
                               :
FIVETECH TECHNOLOGY INC.       :           NO. 10-1060

ORDER

AND NOW, this 19th day of September, 2013, upon
consideration of Fivetech Technology Inc.'s Motion for Summary
Judgment of Non-Infringement of U.S. Patent No. 6,468,012
(Docket Nos. 207, 210), and the response and the reply thereto,
IT IS HEREBY ORDERED, for the reasons stated in a memorandum of
law bearing today's date, that the defendant's motion is
GRANTED. Judgment is hereby ENTERED in favor of the above-named
defendant and against the plaintiff on these claims.

BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

A22

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                    :        CIVIL ACTION
                                 :
            v.                   :
                                 :
FIVETECH TECHNOLOGY INC.         :        NO. 10-1060

MEMORANDUM

McLaughlin, J.                              September 19, 2013

        The plaintiff, Southco, Inc. ("Southco"), is a

manufacturer of hardware, including "panel" or "captive" screws.

The defendant, Fivetech Technology Inc. ("Fivetech"), is a

competitor of Southco. Southco has alleged patent and trademark

infringement by Fivetech. Before the Court is Fivetech's motion

for summary judgment of non-infringement of the '012 patent

(Docket Nos. 207, 210). The Court will grant the motion.


I.    Procedural History

        Southco is a manufacturer of hardware, including panel

screws. Panel screws are also known as "captive screws" or

"fastener screws." Compl. ¶¶ 6-7. Fivetech, is a competitor of

Southco. Answer ¶¶ 2, 7. Southco alleges that Fivetech has

infringed on its patents and trademarks through the sale of

Fivetech Series 46 captive fasteners ("Series 46 screws").

More specifically, Southco alleges infringement on its patent number 5,851,095 ("the '095 patent") issued on December 22, 1998; on its patent number 6,280,131 ("the '131 patent") issued on August 28, 2001; on its patent number 6,468,012 ("the '012 patent") issued on October 22, 2002; and on its Trademark registrations numbers 2,478,685 and 3,678,153. Compl. ¶¶ 11-15 ('095 patent), 20-23 ('131 patent), 28-31 ('012 patent), 36-44 (trademark).

The Court granted summary judgment in favor of Fivetech on both the '095 and '131 patent claims. (Docket Nos. 186, 195). The Court now considers Fivetech's motion for summary judgment of non-infringement of the '012 patent (Docket Nos. 207, 210).

II.  Summary Judgment Record

A captive screw, or captive fastener, is a device that holds a screw in place while the screw is used to connect two panels. A cylindrical ferrule holds the screw, and a knob can be placed over the screw head. Def. Br. at 4-6. The question at issue in this motion is the scope of the claims language of Southco's '012 patent for captive screws.

The Southco '012 patent contains fourteen claims, four of which are independent. All of the fourteen claims are

Case: 14-1390 Case: 14-1390 CASE PARTICIPANTS ONLY Document: 26 Document: 25 Page: 102 Page: 102 Filed: 06/02/2014 Filed: 06/02/2014

Case 2:10-cv-01060-MAM Document 250 Filed 09/20/13 Page 3 of 22

alleged to be infringed. Whether the allegedly infringing screws contain an annular chamfer is in dispute in claims 2-5 and 7-14. Whether the Series 46 screws have material from the fastener's knob fill the annular chamfer is at issue in claims 2-5, 11, and 12. Whether the screws have a plurality of protrusions that function to rigidly secure the screw head to the knob is disputed in claims 1, 6, 8-10, and 14.

The language of the claims, with emphasis added to the disputed portions, is:

> A captive screw attachable to a panel, for attaching the panel to a surface, the surface having a threaded hole, the captive screw comprising:
>
>> a) a screw having a head portion and a shaft having at least a threaded portion, <u>said head portion having an outer perimeter and a plurality of protrusions provided on said outer perimeter of said head portion</u>;
>>
>> b) a knob having an inner surface, <u>wherein said protrusions rigidly secure said head portion to said inner surface of said knob</u>; and
>>
>> c) a ferrule having a first end and a second end through which said shaft extends, said ferrule having a panel attachment means at said first end to secure the captive screw to the panel.

U.S. Patent No. 6,468,012 col.6 ll.14-28 (filed Jul. 24, 2001) (claim 1).

> The captive screw according to claim 1, wherein said head portion has a top surface and a flat, annular bottom surface, <u>said head portion further has an</u>

<u>annular chamfer[1] peripheral to said annular bottom surface of said head portion</u>, and <u>material from said knob fills said chamfer</u>.

<u>Id.</u> col.6 ll.29-33 (claim 2).

Claim 3 is at issue because of it references claim 2:

The captive screw according to claim 2, wherein said knob has a top annular surface against which said head portion of said screw sits.

<u>Id.</u> col.6 ll.34-36 (claim 3).

A captive screw attachable to a panel, for attaching the panel to a surface, the surface having a threaded hole, the captive screw comprising:

a) a screw having a head portion and a shaft having at least a threaded portion, said head portion having a top surface and a flat, annular bottom surface, <u>said head portion further having an annular chamfer peripheral to said annular bottom surface of said head portion</u>;
b) a knob secured to said head portion, <u>wherein material from said knob fills said chamfer</u>; and
c) a ferrule having a first end and a second end through which said shaft extends, said ferrule having a panel attachment means at said first end to secure the captive screw to the panel.

<u>Id.</u> col.6 ll.37-50 (claim 4).

Similarly, claim 5 is at issue because of its

reference to claim 4:

---

[1] To "chamfer" is defined as "to bevel a sharp edge on a machined part." <u>McGraw-Hill Dictionary of Scientific and Technical Terms</u> 365 (6th ed. 2003); Def. Br., Ex. C ("Dornfeld Decl.") ¶ 6. The "chamfer angle" is the angle that the beveled surface makes with one of the original surfaces. <u>McGraw-Hill Dictionary</u>, <u>supra</u>, at 365; Dornfeld Decl. ¶ 6.

The captive screw according to claim 4, wherein said
knob has a top annular surface against which said head
portion of said screw sits.

Id. col.6 ll.51-53 (claim 5).

A captive screw attachable to a panel, for attaching
the panel to a surface, the surface having a threaded
hole, the captive screw comprising:

a) a screw having a head portion and a shaft
having at least a threaded portion, said head
portion having an outer perimeter and a plurality
of protrusions provided on said outer perimeter
of said head portion;
b) a knob secured to said head portion and having
an inner surface, said protrusions matingly
engaging said inner surface of said knob to
thereby help rigidly secure said head portion to
said inner surface of said knob; and
c) a ferrule having a first end and a second end
through which said shaft extends, said ferrule
having a panel attachment means at said first end
to secure the captive screw to the panel.

Id. col.6 l.54 to col.7 l.2 (claim 6).

A captive screw attachable to a panel, for attaching
the panel to a surface, the surface having a threaded
hole, the captive screw comprising:

a) a screw having a head portion and a shaft
having at least a threaded portion, said head
portion having a top surface and a bottom
surface, said head portion further having an
annular chamfer peripheral to said bottom surface
of said head portion;
b) a knob secured to said head portion; and
c) a ferrule having a first end and a second end
through which said shaft extends, said ferrule
having a panel attachment means at said first end
to secure the captive screw to the panel.

Id. col.7 ll.3-15 (claim 7).

A27

The captive screw according to claim 7, <u>wherein said head portion has an outer perimeter and a plurality of protrusions provided on said outer perimeter of said head portion</u>, said knob has an inner surface, and <u>said protrusions matingly engage said inner surface of said knob to thereby help rigidly secure said head portion to said inner surface of said knob</u>.

<u>Id.</u> col.7 ll.16-22 (claim 8). Claim 8 also references claim 7, which discusses the annular chamfer.

Claims 9 and 10 reference claim 8, and are at issue because of those references:

The captive screw according to claim 8, wherein said bottom surface of said head portion is flat and annular, and said flat, annular bottom surface bears against said second end of said ferrule when said shaft is in a fully extended position, whereby a load on said screw is borne directly by said ferrule.

<u>Id.</u> col.7 l.23 to col.8 l.3 (claim 9).

The captive screw according to claim 9, wherein said knob has a top annular surface against which said head portion of said screw sits.

<u>Id.</u> col.8 ll.4-6 (claim 10).

The captive screw according to claim 7, wherein said head portion further has an <u>annular chamfer peripheral to said annular bottom surface of said head portion</u>, and <u>material from said knob fills said chamfer</u>.

<u>Id.</u> col.8 ll.7-10 (claim 11).

Claim 12 is at issue due to its reference to claim 11:

The captive screw according to claim 11, wherein said knob has a top annular surface against which said head portion of said screw sits.

<u>Id.</u> col.8 ll.11-13 (claim 12).

Claim 13 is at issue because it references claim 7:

The captive screw according to claim 7, wherein said knob has a top annular surface against which said head portion of said screw sits.

Id. col.8 ll.14-16 (claim 13).

The captive screw according to claim 13, <u>wherein said head portion has an outer perimeter and a plurality of protrusions provided on said outer perimeter of said head portion</u>, said knob has an inner surface, <u>and said protrusions matingly engage said inner surface of said knob to thereby help rigidly secure said head portion to said inner surface of said knob</u>.

Id. col.8 ll.17-23 (claim 14). Claim 14 is at issue with regard to the annular chamfer because it references claim 13 and, by incorporation, claim 7.

Each claim in the '012 patent requires a captive screw containing three main structural features: the screw, the knob, and the ferrule. The first component, the screw, is described in the preferred embodiment as having an annular flange around the lower end of the screw head and a plurality of protrusions on the outer perimeter of the annular flange. Id. col.3 ll.28-31. The specification also describes how the attachment of the screw to the knob allows material from the inner surface of the knob to fill in the chamfer, creating structural advantages. Id. col.1 ll.62-67.

The second component, the knob, preferably is partially hollow with a hollow cylindrical body that has a

A29

region of increased thickness near the upper end of the knob and a top annular surface against which the head of the screw sits. Id. col.3 ll.24-28. It is also preferably made of a soft material relative to the screw head so that the material in the knob is displaced by the protrusion of the screw in order to rigidly secure the screw to the knob. Id. col.3 ll.33-38.

The ferrule is also hollow and cylindrical, and the threaded shaft of the screw extends through the hollow ferrule. Id. col.3 l.18. When the screw is in its fully extended position, such as when the first panel is screwed down to the second panel, the load of the screw runs directly from the screw to the ferrule to the panel. Id. col.4 ll.31-34.

Standard screws are used in assembling the Series 46 screws. Def. Br., Ex. B ("Wang Decl.") ¶¶ 3-4. Fivetech attaches those screws to the knob using an injection molding process. Id. ¶ 8 (citing Mot. for Partial Summ. J. of Non-Infringement of Claims 16 and 17 of U.S. Patent No. 5,851,095, Ex. B ¶ 5, ECF No. 141-4).

III. <u>Analysis</u>[2]

In a patent infringement case, the court proceeds in two steps. In the first step, the court must construe the claims in the patent. Because a patent is a legal instrument, this is a question of law. The second step is a question of fact to be determined by the jury, unless the Court finds that there is no genuine dispute as to any material fact and that a party is entitled to judgment as a matter of law on whether the patent's claims are infringed. <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370, 384-85 (1996).

    A.   <u>Construing the Claim</u>

In the first step of an infringement claim, the court must determine the scope and meaning of the asserted patent claims. <u>Markman</u>, 517 U.S. at 372-74; <u>Searfoss v. Pioneer</u>

---

[2] A party is entitled to summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact, which may be satisfied by demonstrating the party who bears the burden of proof lacks evidence to support his case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In making its determination, the court must consider the evidence in a light most favorable to the nonmoving party. <u>Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC</u>, 597 F.3d 1374, 1378-79 (Fed. Cir. 2010). Once a properly supported motion for summary judgment is made, the burden of production shifts to the nonmoving party, who must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

Consol. Corp., 374 F.3d 1142, 1148 (Fed. Cir. 2004). The specific language used in the claim section of the patent is the focus of this inquiry. "Claim construction 'begins and ends in all cases with the actual words of the claim.'" Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)).

The language of a claim is given the "ordinary and customary meaning" as understood by a person of ordinary skill in the art in question, unless the patentee provided a different definition for the term. Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); Searfoss, 374 F.3d at 1149. There is a heavy presumption that claim language carries its ordinary and customary meaning.

The court may also consider other intrinsic evidence when construing the claim, such as specifications included in the patent and prior prosecution of the patent. When considering portions of the patent other than the claims, the Federal Circuit has cautioned that courts should not "import into a claim limitations that are not a part of the claim." Superguide Corp. v. DirecTV Enters., 358 F.3d 870, 875 (Fed. Cir. 2004). Claims should rarely be limited by the patent's preferred embodiment description or other specifications in the

A32

patent not included in the claim language. <u>Taskett v. Dentlinger</u>, 344 F.3d 1337, 1340 (Fed. Cir. 2003); <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898 (Fed. Cir. 2004).

Patent language can, however, be helpful. A person of ordinary skill is deemed to read the claim term "in the context of the entire patent, including the specification." <u>Phillips</u>, 415 F.3d at 1313 (quoting <u>Multiform Desiccants, Inc. v. Medzam, Ltd.</u>, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). Claims should be read in the context of surrounding words and as part of a "fully integrated written instrument." <u>Id.</u> at 1314-15. Claims "must be read in view of the specification . . . [which] is always highly relevant to the claim construction analysis. Usually, it is dispositive." <u>Id.</u> at 1315.

The same is true of the prosecution history of the claim. Prosecution history includes arguments distinguishing the patented device from prior art in response to a rejection of the patent claim. <u>Id.</u> at 1317. Although the prosecution history may lack the specificity of a claim, it can "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention." <u>Id.</u> Interpretations which are "disclaimed during prosecution" cannot be included when the claim is construed against an accuser. <u>Id.</u> "Claims may not be construed one way

A33

in order to obtain their allowance and in a different way against accused infringers." Southwall Techs. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Extrinsic evidence, such as dictionaries, treatises, expert testimony, and inventor testimony, can also be considered by the court construing the claims, but are less significant than the patent itself in determining the legally operative language. Phillips, 415 F.3d at 1317. Extrinsic evidence cannot be relied upon to "vary or contradict the clear meaning of terms in the claims." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed. Cir. 2003).

B.    Determining Infringement

The second step, determining infringement, is a factual question to be determined by the by the jury, unless the Court finds that there is no genuine dispute as to any material fact and that a party is entitled to judgment as a matter of law on that issue. There are two types of infringement: literal infringement and infringement under the doctrine of equivalents. Literal infringement requires that every limitation of the patent claim must be found exactly the same in the accused product. If any claim limitation is missing from the accused device, there is no literal infringement. Becton, 616 F.3d at

1253. "There can be no literal infringement where a claim requires two separate structures and one such structure is missing from an accused device." Id. at 1255-56. Infringement under the doctrine of equivalents exists when "the accused device contains an 'insubstantial' change from the claimed invention" or "the element of the accused device 'performs substantially the same function in substantially the same way to obtain the same result.'" TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1376 (Fed. Cir. 2008) (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 38-40 (1997)).

Usually, the court should compare the accused product to the claims of the patent, and not a commercial embodiment of the claimed device. Catalina Lighting, Inc. v. Lamps Plus, Inc., 295 F.3d 1277, 1286 (Fed. Cir. 2002). There is no blanket prohibition, however, against comparing the accused device to a commercial embodiment of the patented device. Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1288 (Fed. Cir. 2010). "[W]hen a commercial product meets all of the claim limitations, then a comparison to that product may support a finding of infringement." Id. at 1289.

C.  Claims 2-5 and 7-14, Requiring an Annular Chamfer

Fivetech argues that the Series 46 screws cannot infringe claims 2-5 and 7-14 of the '012 patent because those claims require the claimed screw head have an "annular chamfer peripheral to said annular bottom surface of said head portion." '012 Patent col.6 ll.29-33. Fivetech claims that its screws have radiused edges.

To succeed on its claim for literal infringement, Southco must prove that Fivetech's Series 46 screws do contain a chamfered edge. Fivetech uses "standard screws" that are manufactured in high volumes with a cold-forming process, whereas chamfered-edged screws require an additional production operation, such as beveling or chamfering. Wang Decl. ¶¶ 3-4; Dornfeld Decl. ¶¶ 11-12. Rather than having an angle where the beveled surface meets another surface, Fivetech argues that its screws instead have radiused, or rounded edges, caused by the cold-forming process. Dornfeld Decl. ¶¶ 7, 11-12. The cold-forming process results in natural round edges on the top and bottom of the screw head. Wang Decl. ¶¶ 4-5. The round angles are caused by the screw mold, which has round angles in the corners. When the metal is pressed into the mold of the screw head, the round angles are formed on the top and bottom edges as

a result of the mold shape. Id. ¶ 5. Fivetech states that the round edge does not provide any function. Id. ¶ 6.

Fivetech also states that there are distinct differences in function, form, and fabrication between radiused and chamfered edges. Dornfeld Decl. ¶ 6. For example, one difference is that a bevel must be purposefully machined into an edge whereas a radiused edge can result from material flow into a mold that features an internal radiused corner. Id. ¶ 8.

Fivetech's expert states that if the Series 46 screws contained the required annular chamfer, then a chamfered angle would exist on the screw. Id. ¶¶ 6, 12. The tests conducted by Dr. Dornfeld, Fivetech's expert witness, show that the Fivetech fasteners contain radii on the edges of the screw portions of the assemblies, rather than chamfered edges. Id. ¶¶ 11, 12. Without the chamfered edges, the screws cannot literally infringe the '012 patent claims requiring an annular chamfer. Because the Series 46 screws have radiused edges rather than chamfered edges, and such edges are not equivalents in form, function, or fabrication, the screws also cannot infringe those claims under a doctrine of equivalents theory.

Southco argues that Fivetech's demonstrative exhibit used at an earlier hearing shows such a chamfered edge. That demonstrative exhibit, presented to the Court in a PowerPoint

presentation during a hearing, is not the accused product. Similarly, Southco argues from a representative engineering drawing that the drawing shows that the head of the screw has an annular chamfer. Because analyzing those pictures does not assist in comparing the accused product against the patent claims, this argument does not dispute Fivetech's argument that its screw does not feature the chamfered edge.

Dr. Pratt, Southco's expert witness, stated that chamfers can be produced by ways other than "purposeful machining," such as by a cold-forming process. Mot. for Decl. of John D. Pratt, Ph.D., P.E., in Supp. of Southco, Inc.'s Opp'n to Fivetech's Mot. for Summ. J. ("Pratt Decl.") ¶¶ 58-61, ECF No. 218. This argument, however, also has little bearing on whether the accused product produced by Fivetech does, in fact, contain annular chamfers.

Finally, Dr. Pratt states that the Fivetech screws are, in fact, beveled, but those bevels are obscured or distorted in Dr. Dornfeld's photographs. Id. ¶¶ 47, 52-53. Dr. Pratt states that this distortion occurred because the sawing operation used by Dr. Dornfeld to prepare his samples caused burrs, which are typically removed by sanding or polishing in the usual procedure. Id. ¶¶ 48-53. Dr. Pratt's conclusory opinion regarding the interpretation of the photographs,

however, is not supported by any evidence in the record. No reasonable jury could conclude that Fivetech's Series 46 screws have an annular chamfer under either a literal infringement or a doctrine of equivalents theory.

D.   Claims 2-5, 11, and 12, Requiring that Material from the Knob Fills the Annular Chamfer

Fivetech argues that its screws do not infringe claims 2-5, 11, and 12 in the '012 patent that "material from said knob fills said chamfer." '012 Patent col.8 ll.7-13; see also id. col.3 ll.29-53. First, Fivetech restates its argument that no chamfer exists on its screws. Second, Fivetech claims that even if its screws did have a chamfer, its injection molding process to manufacture the Series 46 screws does not result in plastic knob material filling that chamfer.

Southco again relies on Fivetech's illustrations in a prior presentation before this Court that allegedly show that no material flows into the chamfer. This argument again is not persuasive because it does not involve any comparison of the accused product to the claims of the patent.

Fivetech's injection molding process used in manufacturing the accused fasteners does not involve knob materials filling a chamfer. The Court wrote in its non-

A39

infringement decision regarding the '095 patent that "[n]o reasonable jury could conclude that Fivetech's process includes displacing knob materials." Southco, Inc. v. Fivetech Tech. Inc., No. 10-1060, 2012 WL 987495, at *4 (E.D. Pa. Mar. 23, 2012), ECF No. 194. That same injection molding process is used to create the accused products. Wang Decl. ¶ 8.

The Court's prior interpretation that no knob materials were displaced is relevant here. The patent specification describes knob material filling or flowing into the chamfer in order to fit the screw head into the knob. The specification states that a "means for attachment of the screw to the knob allows for a press fit of the screw into the knob by filling in a chamfer on the periphery of the screw with material from the inner surface of the knob." '012 Patent col.1 ll.62-65. It further states, "[a]s the screw head 24 is pressed further into the inner surface of the knob 30 . . ., material from the lower end of the region of increased thickness of the knob 33 is pressed such that the material flows into the chamfer 29 area such that this annular ring of material holds the screw head to the knob." Id. col.3 ll.60-65.

Although the word "displace" is not used in the patent claims or specification with relation to the chamfer, that term is used in the preferred embodiment of the patent. The usual

A40

meaning of the word "displace" is "to remove from the usual or proper place: put out of place" or "to crowd out: take the place of especially by force: move from place by occupying the space." Merriam-Webster's Third New International Dictionary Unabridged (2002). Because the same injection molding process at issue in the earlier opinion is used to create the accused products, the term "displace" can again be used to describe how the knob material flows into or fills the chamfer. The Court's earlier opinion, therefore, that no displacement of knob materials occurs in the Series 46 screws is dispositive. No reasonable jury could conclude that material from the knob in Fivetech's Series 46 screws fills any chamfer on those screws.

> E. Claims 1, 6, 8-10, and 14, Requiring that a Plurality of Protrusions Rigidly Secure the Screw Head to the Knob

Fivetech's third argument is that the Series 46 screws cannot infringe claims 1, 6, 8-10, and 14 of the '012 patent because these claims require a screw having a head portion with a "plurality of protrusions" that "rigidly secure" the screw head to the knob. '012 Patent col.6 ll.17-23. Claim 8 of the '012 patent, for example, provides that:

> The captive screw . . . wherein said head portion has an outer perimeter and a plurality of protrusions provided on said outer perimeter . . ., said knob has an inner surface, and said protrusions matingly engage

> said inner surface of said knob to thereby help
> rigidly secure said head portion to said inner surface
> of said knob.

Id. col.7 ll.16-22.

      Although the claims use the term "matingly engage" and "rigidly secure" to describe how the head portion of the screw is attached to the knob, those terms are not defined in the claims or in the specification. The patent specification provides that "the screw head with the protrusions rigidly secures the screw head to the inner surface of the knob and provides a press-fit of the screw to the inner surface of the knob." Id. col.1 ll.53-56. The specification further states how the claimed protrusions displace knob material:

> These protrusions 26 provide a press-fit to the region
> of increased thickness 33 on the inner surface of the
> knob 30 whereby material in the knob 30, which is
> preferably made from a soft material relative to the
> screw head 24 such as aluminum, is displaced by the
> protrusions 26 of the screw 20, which is made from a
> relatively hard material, such as stainless steel. The
> screw 20 is thereby rigidly secured to the knob 30.

Id. col.3 ll.31-38.

      Southco argues that Fivetech's argument, that knob material must be displaced by the protrusions, is a limitation that does not appear in the claims, and to read the claims as containing the word "displaced" would violate claim construction principles.

A42

Again, the Court noted in its previous opinion that no reasonable jury could find that Fivetech's process includes displacing knob materials. <u>Southco</u>, 2012 WL 987495, at *4. Based on this conclusion, it is logical that no reasonable jury could find that the Series 46 screws contain a plurality of protrusions to rigidly secure a screw to the inner surface of a knob by displacing that knob material. As discussed above, the term "displace" can be used to describe how the knob material interacts with the screw head, and the Court's earlier opinion that no displacement of knob materials occurs in the Series 46 screws is dispositive.

Furthermore, the declarations of Mr. Frattarola and Dr. Pratt do not raise a genuine issue of fact. Mr. Frattarola, an engineer at Southco, performed a torque experiment on Fivetech products that purportedly showed that the knobs of the accused Fivetech products were rigidly secured to the screw head. This experiment does not inform this Court's interpretation of the claims containing the "rigidly secured" language or its decision whether the Series 46 screws infringe the '012 patent language. Nowhere in the patent, or in the intrinsic evidence related to the patent, is the term "rigidly secured" defined in terms of torque. Therefore, no reasonable jury could find that the Series 46 screws contain a plurality of

protrusions to rigidly secure the screw to the inner surface of the knob.

Because the Court is persuaded that no reasonable jury could conclude that the Fivetech Series 46 screws infringe the properly construed claims of the '012 patent, the Court will grant the defendant's motion for summary judgment.

An appropriate Order shall issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOUTHCO, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FIVETECH TECHNOLOGY INC. | : | NO. 10-1060 |

<u>ORDER</u>

AND NOW, this 12th day of November, 2013, upon consideration of Motion of Southco, Inc. to Supplement the Record (Docket No. 231), and the response and the reply thereto, IT IS HEREBY ORDERED, for the reasons stated in a memorandum of law bearing today's date, that the plaintiff's motion is DENIED AS MOOT.

Upon consideration of Fivetech Technology's Motion for Partial Summary Judgment of Noninfringement of U.S. Trademark Registrations 2,478,685 and 3,678,153 (Docket No. 198), and the response and reply thereto, IT IS FURTHER ORDERED, for the reasons stated in a memorandum of law bearing today's date, that the defendant's motion is GRANTED. Judgment is hereby ENTERED in favor of the above-named defendant and against the plaintiff on these claims.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

A45

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                    :          CIVIL ACTION
                                 :
          v.                     :
                                 :
FIVETECH TECHNOLOGY INC.         :          NO. 10-1060

<u>ORDER</u>

AND NOW, this 12th day of November, 2013, upon consideration of Plaintiff Southco. Inc.'s Motion to Strike (Docket No. 214), the response, reply, sur-reply, and the response to the sur-reply thereto, IT IS HEREBY ORDERED that the plaintiff's motion is DENIED IN PART AND DENIED AS MOOT IN PART.

Plaintiff requests that this Court strike what it characterizes as new invalidity contentions appearing in Fivetech's motion for partial summary judgment of invalidity of the '012 patent that were not previously raised in Fivetech's invalidity contentions. Plaintiff also requests that the Court strike the declaration of Dr. David Dornfeld filed by Fivetech in support of its motion for partial summary judgment of non-infringement of the '012 patent. (Docket No. 207-3).

First, this Court granted Fivetech's motion for summary judgment of non-infringement of the '012 patent on September 19, 2013. (Docket Nos. 250, 251). In that opinion, the Court relied on the declaration of Dr. Dornfeld.

A46

Fivetech timely identified David Dornfeld, Ph.D. as an expert. Fivetech argues that, because it does not have the burden of persuasion on the issue of infringement, its only use for Dr. Dornfeld is as a rebuttal expert in response to Southco's expert report of John D. Pratt, Ph.D, P.E. Pl. Opp. at 7, ECF No. 221. Fivetech chose not to prepare a rebuttal report to Dr. Pratt's report in order to conserve time and costs and because it was convinced that Southco could not meet its burden. Pl. Opp. at 8.

Even if Fivetech would have been more strictly in compliance with the Federal Rules of Civil Procedure and this Court's Scheduling Order (Docket No. 62) by filing a rebuttal report, the Court finds that there was no prejudice to Southco by Fivetech not filing a rebuttal report because Southco had an opportunity to rebut Dr. Dornfeld's declaration in its opposition to the motion for summary judgment on non-infringement. (Docket No. 216). Southco's opposition engaged with Dr. Dornfeld's declaration by arguing to the Court why Dr. Pratt's earlier declaration contradicted Dr. Dornfeld's statements.

The Court will therefore deny Southco's motion to strike Dr. Dornfeld's declaration from the motion for summary judgment of non-infringement of the '012 patent.

Second, the Court has denied without prejudice Fivetech's motion for partial summary judgment of invalidity of the '012 patent on November 12, 2013. Because this motion was denied without prejudice, and Fivetech can potentially raise these issues at a later date, the Court will not address the merits of Southco's motion to strike as to that motion. Therefore, the portion of Southco's motion to strike regarding the patent invalidity contentions is denied as moot.

BY THE COURT:

/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                    :        CIVIL ACTION
                                 :
        v.                       :
                                 :
FIVETECH TECHNOLOGY INC.         :        NO. 10-1060

MEMORANDUM

McLaughlin, J.                              November 12, 2013


        The plaintiff in this case, Southco, Inc. ("Southco"),
is a manufacturer of hardware, including "panel" or "captive"
screws. The defendant, Fivetech Technology Inc. ("Fivetech"),
is a competitor of Southco. Southco has alleged patent and
trademark infringement by Fivetech. Before the Court is
Fivetech's motion for partial summary judgment of
noninfringement of U.S. Trademark Registrations 2,478,685 and
3,678,153 (Docket No. 198) and Southco's motion to supplement
the record (Docket No. 231). The Court will grant the motion
for partial summary judgment and deny as moot the motion to
supplement.


I.    Procedural History

        Southco is a manufacturer of hardware, including panel
screws, which are also known as "captive screws" or "fastener
screws." Compl. ¶¶ 6-7. Fivetech is a competitor of Southco.
Answer ¶¶ 2, 7. Southco alleges that Fivetech has infringed its

A49

patents and trademarks through the sale of Fivetech's captive fasteners.

More specifically, Southco alleges infringement on its patent number 5,851,095 ("the '095 patent") issued on December 22, 1998; on its patent number 6,280,131 ("the '131 patent") issued on August 28, 2001; on its patent number 6,468,012 ("the '012 patent") issued on October 22, 2002; and on its Trademark registrations numbers 2,478,685 and 3,678,153. Compl. ¶¶ 11-18 ('095 patent), 19-26 ('131 patent), 27-34 ('012 patent), 35-44 (trademark).

The Court granted summary judgment in favor of Fivetech on both the '095 and '131 patent claims. (Docket Nos. 185, 186, 194, 195). The Court also granted summary judgment in favor of Fivetech on the '012 patent claims. (Docket Nos. 250, 251). The Court now considers Southco's motion to supplement the record (Docket No. 231) and Fivetech's motion for partial summary judgment of noninfringement of U.S. Trademark Registrations 2,478,685 and 3,678,153 (Docket No. 198).

II.  Summary Judgment Record

        Southco has two registered trademarks for the
"Segmented Circle" design that appears on its fasteners.
Compl., Ex. E, F; Def. Br. at 2, ECF No. 198. On some of its
fasteners, Fivetech uses a "Five Pentagon" mark, which Southco
alleges infringes on the Segmented Circle design. Compl., Ex.
A; Def. Br. at 2.

        The primary issue in this summary judgment motion is
whether Fivetech's Five Pentagon mark was used in United States
commerce, so that the Lanham Act applies. The parties do not
dispute the relevant facts, but argue whether those facts show
use in commerce. There are four possible uses of Fivetech's
Five Pentagon mark in United States commerce.


    A.  Sale of Captive Screws to SRI

        In December 2009, Fivetech sold 500 fasteners to a
company called Specialty Resources, Inc. ("SRI") in
Pennsylvania. Def. Mot. Dismiss, Hsinyi Wang Decl. ¶ 11, ECF
No. 23-3. Following this sale, a Fivetech employee sent an SRI
employee price quotes on other Fivetech fasteners, but Fivetech
never sold SRI any additional products. Id. ¶¶ 16-17. The 500
fasteners sold to SRI did not feature Fivetech's Five Pentagon

mark. Def. Reply Mot. Dismiss, Supplemental J. Wang Decl. ¶ 12, ECF No. 26-1.

    B.   <u>Fivetech's Patent Application</u>

       On March 25, 2010, Mr. Steven Rabin, a lawyer acting on behalf of Fivetech, filed a trademark application for the Five Pentagon mark with the United States Patent and Trademark Office. Pl. Opp. Mot. Dismiss, Ex. B, ECF No. 24-2. In response to a prompt, the application states that the "first use in commerce" of the Five Pentagon mark was "[a]t least as early as 03/10/2010" and that the Five Pentagon mark was in use in commerce at the time of the application. <u>Id.</u> The application was withdrawn and abandoned on June 24, 2010. Def. Mot., Allen Decl., Ex. J, ECF No. 198-11. Fivetech's president, Gary Wang, did not know that this application was filed, and according to Mr. Wang, Fivetech "does not use its mark in commerce in the United States, since Fivetech does not market or sell products in the United States." Def. Mot. Dismiss Supplemental Br., G. Wang Decl. ¶ 20, ECF No. 44-1.

C.    Fivetech's Website and Catalogue

Fivetech's online catalogue, available on its website and therefore accessible from the United States, includes descriptions of fasteners bearing the Five Pentagon mark. Compl., Ex. A, ECF No. 1-1. This document is an exhibit attached to Southco's Complaint, but there is no accompanying affidavit to explain what it is or from where it came.

D.    The HP Servers

Fivetech sells its captive fasteners bearing the Five Pentagon mark to its customers in Asia, such as Inventec, who incorporate those captive fasteners into computer servers sold to companies such as Hewlett-Packard ("HP"). HP servers containing Fivetech's fasteners are sold in the United States. Def. Mot. Dismiss Supplemental Br., G. Wang Decl. ¶¶ 16-18, ECF No. 44-1; Pl. Opp. Mot. Dismiss, Sluzas Decl. ("First Sluzas Decl.") ¶ 17, ECF No. 24-1; Pl. Second Mot. Compel Disc. Resps., Sluzas Decl. ("Second Sluzas Decl.") ¶ 11, ECF No. 196-1. Although Fivetech does not sell these fasteners directly to HP, it does tailor the fastener to their needs, for example, by selling Inventec fasteners in "HP Blue" the color HP uses in its servers. Pl. Reply Mot. Dismiss Supplemental Br., Cloarec Decl.

¶¶ 8-10, ECF No. 45-1. Fivetech's Five Pentagon mark is used on the captive screws in at least some of those HP servers. First Sluzas Decl., Ex. K; Def. Br. at 6.[1]

III. Analysis

Fivetech argues that (1) its Five Pentagon mark has never been used in United States commerce, and therefore the Lanham Act does not apply; and (2) even if the Lanham Act applies, Southco could not prevail on its trademark infringement claim because there has been no showing of facts that support a likelihood of confusion between Fivetech's Five Pentagon mark and Southco's Segmented Circle mark.

Southco argues that the Lanham Act applies, because the Five Pentagon mark has been used in United States commerce, or the substantial effect of its use abroad supports this Court's exercise of extraterritorial jurisdiction. Southco also argues that there is a triable issue on likelihood of confusion.

---

[1] In addition, a declaration by one of Southco's employees purports to attach photographs of captive screws with the Fivetech Five Pentagon mark in another company's servers. Pl. Opp. at 11, ECF No. 204; see also Riblett Decl., ECF No. 205 (under seal). The Court notes that there is no evidence substantiating that these photographs show another company's server, and other photographs suggest that the screw may belong to an HP server.

The Court concludes that the Lanham Act does not apply here because Fivetech's Five Pentagon mark has not been used in United States commerce and it has not had a substantial effect on United States commerce.

A.    Applicability of the Lanham Act

The purpose of the Lanham Act is twofold: to protect consumers from purchasing a good that deceptively appears to be the genuine trademarked good, but is not; and to protect the trademark holder's investment in goodwill, which is undermined by imitation goods. Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 672 (3d Cir. 1989).

The Lanham Act applies to "use in commerce" of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . ." 15 U.S.C. § 1114(1)(a). Under the Act, "commerce" means "all commerce which may lawfully be regulated by Congress." Id. § 1127. A "mark shall be deemed to be in use in commerce-- (1) on goods when-- (A) it is placed in any manner on the goods or their

containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce . . . ." <u>Id.</u>

Absent unusual circumstances, advertising alone is not enough to constitute "use in commerce" because the statute requires that the good itself be sold or transported in commerce. <u>See</u> <u>Buti v. Perosa, S.R.L.</u>, 139 F.3d 98, 105 (2d Cir. 1998) ("[T]he mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of the mark 'in commerce,' within the meaning of the Lanham Act."); <u>see also</u> <u>Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercles des Etrangers a Monaco</u>, 329 F.3d 359, 364 (4th Cir. 2003).

Thus, neither Fivetech's website, product catalogue, nor price quotes to SRI can constitute "use in commerce" of the Five Pentagon mark. None of these involved the Five Pentagon mark being sold or transported in United States commerce. Likewise, the sale of 500 fasteners to SRI is not relevant, as those fasteners did not contain the Five Pentagon mark. Pl. Reply at 4 n.4, ECF No. 211.

A56

Southco's argument that the offer to sell goods in the United States can constitute infringement under the Lanham Act is correct, but the issue here is whether an offer to sell goods is a "use in commerce" that brings the defendant's actions within the purview of the Act. It is not.

The next possible use in United States commerce, the use of the Fivetech's Five Pentagon mark in HP servers sold in the United States, is addressed below as an issue of extraterritorial jurisdiction.

The last remaining use of Fivetech's Five Pentagon mark that could support its use in United States commerce is the sworn statement of attorney Rabin, in Fivetech's trademark application, that Fivetech's Five Pentagon mark was used in United States commerce.

The Court concludes that no reasonable jury could find that Fivetech's Five Pentagon mark was used in United States commerce solely on the basis of the trademark application. The application was withdrawn three months after it was filed. The president of Fivetech did not know the application was made, nor did he know that Rabin had been hired by his local counsel. In the initial briefing on the motion for partial summary judgment, Southco offered no evidence that supported Mr. Rabin's statement

that the Five Pentagon mark was sold in United States commerce beyond the few instances discussed here.

The Court denies as moot, as discussed below, Southco's motion to supplement the record on this issue, because the Court concludes that the new information does not change the result that there is no use of Fivetech's Five Pentagon mark in United States commerce.


B.    Extraterritorial Jurisdiction Under the Lanham Act

Southco argues that this Court should exercise extraterritorial jurisdiction under the Lanham Act. The Supreme Court first examined the extraterritorial reach of the Lanham Act in 1952 in Steele v. Bulova Watch Co., 344 U.S. 280 (1952). In Bulova, the Court held that the Lanham Act applied to a United States citizen who sold watches bearing the plaintiff's trademark in Mexico. The Court held that his operations affected United States commerce because he bought component parts in the United States, and the watches bearing the spurious Bulova mark entered the United States from Mexico, causing consumer confusion and harm to the plaintiff's domestic goodwill.

Circuit courts have turned Bulova into a multi-factor analysis. The best-known test is from the Second Circuit, where the court looks at three factors: (1) whether the defendant is a United States citizen; (2) whether there exists a conflict between the defendant's trademark rights under foreign law and the plaintiff's rights under United States law; and (3) whether the defendant's conduct has a substantial effect on United States commerce. See Alt. Richfield Co. v. Arco Globus Int'l Co., 150 F.3d 189, 192 (2d Cir. 1998).[2]

There is no dispute about the first two factors. Fivetech is not a United States citizen. That factor supports a lack of jurisdiction. There is no alleged conflict between Fivetech's trademark rights under foreign law and Southco's trademark rights under United States law. Although Fivetech notes that it has trademark protection outside of the United States, it does not offer evidence to support that claim or any argument on how a ruling by this Court would affect those

---

[2] The Ninth Circuit requires a showing of additional factors. Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 554 (9th Cir. 1992). The First Circuit holds that there is jurisdiction if the defendant is a United States citizen, but if the defendant is a foreign citizen and the activities occurred abroad, the Lanham Act applies only if the defendant's actions have "substantial effects" on United States commerce. McBee v. Delica Co., 417 F.3d 107, 111 (1st Cir. 2005). In a nonprecedential opinion, the Third Circuit favorably cited the Second Circuit test. See Scanvec Amiable Ltd. v. Chang, 80 F. App'x 171, 181 (3d Cir. 2003).

rights. This factor is either neutral or in favor of the
exercise of jurisdiction. On the third factor, the parties
differ.

In Bulova, the Court focused on both the use of United
States commerce to produce the defendant's products, and the
misleading effects of the spurious mark entering the United
States, including the harm to Bulova's goodwill from the mark.
Therefore, in determining substantial effects, courts focus on
those two elements. Where there is a likelihood of confusion
from the defendant's product entering the United States, the
substantial effects test is satisfied. See Fun-Damental Too,
Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 1006-07 (2d Cir. 1997)
(importing products into the United States has a substantial
effect on United States commerce). Where those two elements are
absent, there is no substantial effect.

In Atlantic Richfield, the plaintiff alleged trademark
infringement by the defendant, a small company with offices in
the United States but no operations or sales of its products in
the United States. The court held that if an alleged
infringer's use of a mark "does not mislead American consumers
in their purchases or cause them to look less favorably upon the
mark," and "the alleged infringer does not physically use the

A60

stream of American commerce to compete with the trademark owner
by, for example, manufacturing, processing, or transporting the
competing product in United States commerce," and "none of the
alleged infringer's American activities materially support the
foreign use of the mark," then there is no substantial effect.
150 F.3d at 193-94.

That is the case here. There is no allegation that
Fivetech uses the United States stream of commerce to
manufacture, process, or sell any of its products, beyond the
one sale to SRI already discussed. Southco argues that the
presence of the Fivetech fasteners with the Five Pentagon mark
in HP servers available in the United States has a substantial
or significant effect on United States commerce. But there is
no evidence that the presence of Fivetech fasteners in servers
confuses purchasers of the HP servers or cause consumers to look
less favorably upon Southco's Segmented Circle mark. Indeed,
there is no evidence that those who buy HP servers are even
Southco's consumers. Instead, the manufacturers of the servers
are consumers of both Fivetech and Southco. In Bulova, the
defendant's watches containing the infringed mark were making
their way into the United States, damaging the plaintiff's
goodwill among its customers. There is no allegation or

evidence in this case that Fivetech's fasteners are unknowingly being purchased by Southco customers.

Southco also argues that there is a disputed issue of fact on the effect of Fivetech's Taiwan and China sales on United States commerce, but Southco does not expand upon this statement. An American company's lost sales abroad because of trademark infringement can be considered when in the substantial effect analysis. Rodgers v. Wright, 544 F. Supp. 2d 302, 313 (S.D.N.Y. 2008). In many cases supporting this proposition, however, there are additional effects in the United States beyond the diverted sales. See, e.g., Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n, 701 F.2d 408, 415 (5th Cir. 1983) (production of infringing good occurred in United States); Software AG, Inc. v. Consist Software Solutions, Inc., No. 08-389, 2008 WL 563449, at *14 (S.D.N.Y. Feb. 21, 2008) (falsely advertised support services would be provided from a United States office); Warnaco Inc. v. VF Corp., 844 F. Supp. 940, 944, 950-51 (S.D.N.Y. 1994) (contracts between plaintiff and defendant negotiated in New York and governed by New York law).

Southco presents no evidence of activity by Fivetech in the United States involving the Five Pentagon mark, even when considering Southco's supplemental evidence. Southco does not

explain how Fivetech's activities outside the United States affect its trademark rights, except as already discussed. Therefore, Southco's claim does not support extraterritorial jurisdiction under the Lanham Act.

Because the Court finds that the Lanham Act does not apply, the Court need not address on the merits the parties' trademark infringement arguments regarding likelihood of confusion.

IV. <u>Motion to Supplement</u>

Southco filed a Motion to Supplement the Record (Docket No. 231) with additional evidence allegedly showing that Fivetech sells captive screws with the Five Pentagon mark in the United States. Southco seeks to admit the documents it calls the "Fivetech U.S. Shipping Documents," which include several website printouts from a business periodical, computer parts websites allegedly showing Fivetech merchandise for sale, and shipping documents from several commercial providers of U.S. Customs data. Southco argues that these documents show shipments of captive screws from Fivetech to Hon Hai Precision Industry in Houston, Texas, with arrival dates in the port of Los Angeles on March 12, 2012, May 15, 2012, and July 24, 2012.

Pl. Mot. Supplement, Sluzas Decl. ("Third Sluzas Decl.") ¶ 4, ECF No. 231-1.

In response, Fivetech submitted a declaration stating that Fivetech has not sold any Series 46 captive screws in the United States, other than the one sale to SRI in December 2009. Def. Opp. Mot. Supplement, Ex. A ¶ 5, ECF No. 247-1.

The Court will deny as moot this motion to supplement the record. The considers the evidence submitted by Southco for purposes of this motion, but the Court finds that the supplementary evidence introduced by Southco does not affect the Court's grant of Fivetech's motion for partial summary judgment of trademark noninfringement. First, neither the websites nor the other shipping documents show that Fivetech is selling captive screws with the Five Pentagon mark in the United States. Second, the Fivetech U.S. Shipping Documents have serious admissibility issues.

The evidence that Southco seeks to include in the record presents serious issues with regard to hearsay and authenticity. First, newspaper articles are considered hearsay and, only in very exceptional circumstances not present here, may be used as evidence during litigation. See May v. Cooperman, 780 F.2d 240, 262 n.10 (3d Cir. 1985).

Internet websites and web postings are also typically inadmissible as hearsay. United States v. Jackson, 208 F.3d 633, 637-38 (7th Cir. 2000). Although some commentators have argued that websites could be admissible as a business record under Rule 803(6), other federal courts have come out the opposite way. Compare 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:79 (3d ed.), with Aldana v. Del Monte Fresh Produce N.A., Inc., 578 F.3d 1283, 1291 n.3 (11th Cir. 2009).

District courts have also gone both ways with regard to the commercial lists hearsay exception under Rule 803(17). Compare Commercial Credit Grp., Inc. v. Falcon Equip., LLC of Jax, No. 3:09CV376-DSC, 2010 WL 144101, at *12 (W.D.N.C. Jan. 8, 2010), with Rainbow Play Sys., Inc. v. Backyard Adventure, Inc., No. 06-4166, 2009 WL 3150984, at *2-3 (D.S.D. Sept. 28, 2009).

Furthermore, even website evidence admissible under a hearsay exception requires authentication. See St. Luke's Cataract & Laser Inst., P.A. v. Sanderson, No. 8:06CV223TMSS, 2006 WL 1320242, at *2 (M.D. Fla. May 12, 2006) ("To authenticate printouts from a website, the party proffering the evidence must produce 'some statement or affidavit from someone with knowledge [of the website] . . . for example [a] web master

A65

or someone else with personal knowledge would be sufficient.'"
(quoting In re Homestore.com, Inc. Sec. Litig., 347 F. Supp. 2d
769, 782 (C.D. Cal. 2004))); see also Wady v. Provident Life &
Accident Ins. Co. of Am., 216 F. Supp. 2d 1060, 1064-65 (C.D.
Cal. 2002). This is a common problem with the evidence
presented by Southco because no one with personal knowledge has
given a sworn statement regarding these websites.[3]

Some of the specific shipping documents that Southco
seeks to admit, bills of lading, are themselves admissible under
the business records exception with appropriate foundation
through affidavit, deposition, or other authentication method.
See, e.g., United States v. Collado, 439 F. App'x 845, 848 (11th
Cir. 2011); Sea-Land Serv., Inc. v. Lozen Int'l, LLC, 285 F.3d
808, 819-20 (9th Cir. 2002); Morrison Grain Co. v. Utica Mutual
Ins. Co., 632 F.2d 424, 432 (5th Cir. 1980); Stein Hall & Co.,
Inc. v. S.S. Concordia Viking, 494 F.2d 287, 291 (2d Cir. 1974)
(quoting Palmer v. Hoffman, 318 U.S. 109, 113 (1943)); United
States Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.,
296 F. Supp. 2d 1322, 1327 n.2 (S.D. Ala. 2003); see also CSX

---

[3] Southco does offer the signed affidavit of the co-founder
and managing director of one of the websites compiling U.S.
Customs Records, but that affidavit was filed in the Eastern
District of Wisconsin in 2010 in an unrelated case. Pl. Reply
Mot. Supplement, Sluzas Decl. ("Fourth Sluzas Decl."), Ex. C,
ECF No. 248-1.

Transp. Co. v. Novolog Bucks Cnty., No. 04-4018, 2008 WL
4613862, at *5-6 (E.D. Pa. Oct. 16, 2008). The websites sought
to be admitted by Southco add an additional layer of potential
hearsay, however, that requires further authentication of the
website's source material.


V. Conclusion

     For the foregoing reasons, the Court denies as moot
the Motion of Southco, Inc. to Supplement the Record (Docket No.
231) and grants Fivetech's Motion for Partial Summary Judgment
of Noninfringement of U.S. Trademark Registrations 2,478,685 and
3,678,153 (Docket No. 198).

     An appropriate Order shall issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.               :        CIVIL ACTION
                            :
        v.                  :
                            :
FIVETECH TECHNOLOGY INC.    :        NO. 10-1060

ORDER

AND NOW, this 12th day of November, 2013, upon
consideration of Fivetech's Motion for Summary Judgment of
Invalidity of U.S. Patent No. 6,468,012 (Docket No. 206), and
the response and the reply thereto, IT IS HEREBY ORDERED, for
the reasons stated in a memorandum of law bearing today's date,
that the defendant's motion is DENIED WITHOUT PREJUDICE.


                        BY THE COURT:


                        /s/ Mary A. McLaughlin
                        MARY A. McLAUGHLIN, J.

```
                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SOUTHCO, INC.                      :         CIVIL ACTION
                                   :
           v.                      :
                                   :
FIVETECH TECHNOLOGY INC.           :         NO. 10-1060
```

<u>MEMORANDUM</u>

McLaughlin, J.                                    November 12, 2013


      The plaintiff, Southco, Inc. ("Southco"), is a
manufacturer of hardware, including "panel" or "captive" screws.
The defendant, Fivetech Technology Inc. ("Fivetech"), is a
competitor of Southco. Southco has alleged patent and trademark
infringement by Fivetech. Before the Court is Fivetech's motion
for summary judgment of invalidity of U.S. Patent No. 6,468,012
(the "'012 patent") (Docket No. 206). The Court will deny the
motion without prejudice.


I. <u>Procedural History</u>

      Southco is a manufacturer of hardware, including panel
screws. Panel screws are also known as "captive screws" or
"fastener screws." Compl. ¶¶ 6-7. Fivetech is a competitor of
Southco. Answer ¶¶ 2, 7. Southco alleges that Fivetech has
infringed on its patents and trademarks through the sale of
Fivetech Series 46 captive fasteners ("Series 46 screws").

More specifically, Southco alleges infringement on its patent number 5,851,095 ("the '095 patent") issued on December 22, 1998; on its patent number 6,280,131 ("the '131 patent") issued on August 28, 2001; on its patent number 6,468,012 ("the '012 patent") issued on October 22, 2002; and on its Trademark registrations numbers 2,478,685 and 3,678,153. Compl. ¶¶ 11-18 ('095 patent), 19-26 ('131 patent), 27-34 ('012 patent), 35-44 (trademark).

The Court granted summary judgment in favor of Fivetech on both the '095 and '131 patent claims. The Court also granted summary judgment in favor of Fivetech on the '012 patent claims. The Court now considers Fivetech's motion for summary judgment of invalidity of the '012 patent. Fivetech raised invalidity as both an affirmative defense to Southco's complaint and as a separate counterclaim for a declaratory judgment of invalidity. Answer ¶¶ 47, 84-87.

II. <u>Analysis</u>

The Supreme Court has held that a decision of noninfringement does not necessarily moot a counterclaim that raises patent invalidity. See <u>Cardinal Chem. Co. v. Morton Int'l, Inc.</u>, 508 U.S. 83, 94-99 (1993). A district court is not compelled, however, to decide an invalidity counterclaim after

Case: 14-1390 Case: 14-1390 CASE PARTICIPANTS ONLY Document: 25 Document: 14-2 Page: 148 Page: 148 Filed: 06/02/2014 Filed: 06/02/2014

Case 2:10-cv-01060-MAM Document 254 Filed 11/12/13 Page 3 of 5

entering a judgment of non-infringement because of the discretion afforded to district courts under the Declaratory Judgment Act. Id. at 95 n.17.

Although the Supreme Court has indicated that it is the better practice for lower courts in infringement suits to inquire into the validity question, Sinclair & Carroll Co. v. Interchem. Corp., 325 U.S. 327, 330 (1945), this has not been construed as a peremptory direction, but rather a matter of the trial court's discretion. Judge Learned Hand, in Harries v. Air King Prods. Co., 183 F.2d 158 (2d Cir. 1950), suggested that the "better practice" statement in Sinclair & Carroll Co. was discretionary, with a requirement to reach the issue of validity only if the patent is so "evidently invalid" that it should not be allowed to stand as a "scarecrow." Id. at 162-63.

Most Courts of Appeals recognize that both trial and appellate courts have some discretion to hold a patent not infringed and decline to rule on validity. See, e.g., Broadview Chem. Corp. v. Loctite Corp., 474 F.2d 1391, 1394 (2d Cir. 1973); Marvin Glass & Assocs. v. Sears, Roebuck & Co., 448 F.2d 60, 62-63 (5th Cir. 1971); M.O.S. Corp. v. John I. Haas Co., 375 F.2d 614, 616-17 (9th Cir. 1967); Dow Chem. Co. v. Skinner, 197 F.2d 807, 811-12 (6th Cir. 1952).

The Federal Circuit has mandated that a motion involving the patent invalidity issue be dismissed without prejudice if the court declines to rule on it. "A district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice, subject to review only for abuse of discretion." Liquid Dynamics Corp. v. Vaughn Co., 355 F.3d 1361, 1371 (Fed. Cir. 2004); see also Korszun v. Pub. Techs. Multimedia, Inc., 96 F. App'x 699, 700 (Fed. Cir. 2004); Nystrom v. TREX Co., 339 F.3d 1347, 1351 n.* (Fed. Cir. 2003).

Not only has the Court decided that the '012 patent is not infringed (Docket Nos. 250, 251), but Fivetech filed a revised request for reexamination of the '012 patent on February 29, 2012, which is still pending in the U.S. Patent and Trademark Office ("PTO"). This revised request for reexamination was granted for claims 1, 6-8, 13, and 14, and denied for the other claims, on March 30, 2012. The Examiner rejected those claims as anticipated and/or obvious on January 8, 2013. Southco filed a notice to appeal the reexamination decision on March 1, 2013. Southco requested an oral hearing on August 19, 2013, and as of November 7, 2013, the Patent Trial and Appeal Board has scheduled a reexamination hearing for December 18, 2013.

A72

        The pending reexamination of the '012 patent convinces
this Court that it should decline to decide Fivetech's motion
for summary judgment on patent invalidity. In light of the
grant of Fivetech's motion for summary judgment on
noninfringement and because of the potential for the PTO to
conclude that some of the subject matter of the '012 patent is
not patentable, the Court denies Fivetech's motion for summary
judgment on patent invalidity without prejudice.

        An appropriate Order shall issue.

## PROOF OF SERVICE

I hereby certify that on this 2nd day of June 2014, I electronically filed the

foregoing document with the Clerk of the United States Court of Appeals for the

Federal Circuit using the CM/ECF system, which will send notice of such filing to

all registered CM/ECF users in this case.


*/s/ Brian S. Seal*
Brian S. Seal

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,571 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

_/s/ Benjamin E. Leace_
Benjamin E. Leace
Brian S. Seal
Andrew J. Koopman
Christopher H. Blaszkowski
RATNER PRESTIA
1235 WESTLAKES DRIVE
SUITE 301
BERWYN, PA 19312
610−407−0700

_Attorneys for Plaintiff-Appellant_
_Southco, Inc._

June 2, 2014